Filed 1/13/14

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| MAX TAYLOR,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NABORS DRILLING USA, LP,<br><br>    Defendant and Appellant. | 2d Civil No. B241914<br>(Super. Ct. No. 56-2011-00393016<br>CU-WT-VTA)<br>(Ventura County) |

In this first impression case, we hold that a defective special verdict form is subject to harmless error analysis.

Max Taylor, respondent, filed an action alleging hostile work environment sexual harassment against his former employer, Nabors Drilling USA, L.P., appellant. The action was brought pursuant to the California Fair Employment and Housing Act (FEHA). (Gov. Code, § 12900 et seq.)[1] Judgment was entered in respondent's favor after a jury returned a $160,000 special verdict in his favor.

The trial court denied appellant's motion for judgment notwithstanding the verdict (JNOV), and awarded respondent attorney fees of $680,520.

Appellant argues that the motion for JNOV should have been granted because (1) the evidence is insufficient to show that respondent "was harassed *because of* his sex and/or perceived sexual orientation," and (2) the special verdict is fatally defective. In addition, appellant challenges an award of $150,000 for past noneconomic damages and an award of

---

[1] All statutory references are to the Government Code unless otherwise stated.

$10,000 for past economic damages.  Finally, appellant contends that the attorney fee award is excessive.

We affirm the denial of the motion for JNOV and the award of attorney fees.  We agree with appellant that the evidence is insufficient to support an award of economic damages.  Accordingly, we reduce respondent's total recovery from $160,000 to $150,000.  We affirm the judgment as modified.

*Factual and Procedural Background*

Appellant is a drilling contractor.  In June 2010 it hired respondent as a "floorhand" on an oil rig.  The parties stipulated that Joe Mason and Jaime Mendez were respondent's supervisors within the meaning of the FEHA.

Several times a day, Mason called respondent a "queer," "fagot," "homo," and "gay porn star."  Respondent was "humiliated."  He testified: "I didn't have a name.  My name was not Max.  It was queer.  It was homo.  The whole time."  "[E]verything was basically f'ing fagot, come here, f'ing homo, come here, grab that."

When respondent had an infection on his face, Mason said, in the drilling crew's presence, "let me cum [ejaculate] on your face, it will make it clear right up."  The crew laughed.  Respondent "was extremely disturbed and humiliated."

Respondent protested to Mason that he was not a homosexual and that he had a girlfriend.  Mason "laughed and . . . called [respondent] a pussy [and told him to] get back to work."  Mason already knew that respondent had a girlfriend.  Before respondent started working for appellant, he and his girlfriend attended a barbecue at Mason's house.  During the first week that respondent worked for appellant, his girlfriend drove him to work and, at the end of the day, Mason drove respondent to his girlfriend's place of work.  At that time, respondent did not have his own vehicle.  Respondent's girlfriend went shopping with Mason's wife.

Mason posted a photograph of respondent on a wall inside the employees' restroom.  The photograph "had a big target around [respondent's] mouth, and [in] the left corner it said 'Give me the money shot.' "  Respondent's counsel argued to the trial court that the target and accompanying notation "indicate an act of oral sex."  Respondent was "deeply

2

disturbed" by the posting of the photograph: "Every single member in my crew went in this restroom . . . [and] saw my picture, and they were laughing about it."

Respondent tore the photograph off the wall and confronted Mason, who denied posting it. At a crew meeting the next morning, Mason said, "[W]hoever posted the picture of [respondent], you guys quit fucking around with him because it is going to hurt his gay porn career." Mason was apparently alluding to respondent's legitimate acting career. Three or four times, respondent had appeared as an "extra" in films. He had also done "a lot of theater."

Jaime Mendez also sexually harassed respondent. One day when Mendez was standing on the elevated rig floor and respondent was beneath him, Mendez urinated on respondent. Mendez "started laughing about it." Respondent "was infuriated, disgusted, disturbed." Mendez "would come up behind [respondent] and . . . spank [his] butt all the time." Respondent said, "I'm not gay; don't touch me." But Mendez continued the behavior. Sometimes Mendez "would arouse himself in his overalls to get an erection" and then ask respondent to sit on his lap. Mendez testified that he did not consider respondent to be gay.

When asked to describe his relationship with Mendez, respondent replied: "It was the worst working environment I have ever been through in my life. Words can't describe [it]. . . . It was inhumane . . . the way they treated me."

Respondent's girlfriend, who was living with him while he was working for appellant, testified that every day he would come home from work "very emotional" and "upset" because of "[a]ll the derogatory statements that he was told at work."

In September of 2010, respondent contacted appellant's human resources department and complained about the harassment. After his complaint, Mason did not return to the rig. Mendez continued to work with respondent, but he stopped his sexual harassment. About a week later, appellant suspended Mason for two weeks and began an investigation of the harassment claim. At the conclusion of the investigation, appellant terminated Mason from employment.

3

On December 19, 2010, appellant terminated respondent's employment. According to appellant, respondent had often been late for work, had been late for one mandatory safety meeting and had missed another, had left his shift early without permission while falsely declaring that he had permission, and had screamed and cursed at Mendez, his direct supervisor, when Mendez asked him "to do a simple job task."

In March 2011 respondent filed a complaint against appellant. The complaint consisted of four causes of action: (1) hostile work environment sexual harassment, (2) failure to prevent sexual harassment, (3) unlawful retaliation, and (4) wrongful retaliation and termination in violation of public policy.

The jury returned a special verdict in favor of respondent on only one cause of action, i.e., for hostile work environment sexual harassment. It found that respondent's harassment complaint had not been "a motivating reason for [appellant's] decision to discharge [him]." The jury awarded respondent damages totaling $160,000: $10,000 for past economic loss and $150,000 for past noneconomic loss.

*Hostile Work Environment Sexual Harassment*

The FEHA makes it an unlawful employment practice for an employer to harass an employee because of the employee's "sex, gender, gender identity, gender expression, . . . or sexual orientation." (§ 12940, subd. (j)(1).) " '[T]he prohibition against sexual harassment includes protection from a broad range of conduct, [including] the creation of a work environment that is hostile or abusive on the basis of sex.' [Citation.]" (*Lyle v. Warner Bros. Television Productions* (2006) 38 Cal.4th 264, 277 (*Lyle*).) "[A] hostile work environment sexual harassment claim requires a plaintiff employee to show [he or] she was subjected to sexual advances, conduct, or comments that were (1) unwelcome [citation]; (2) because of sex [citation]; and (3) sufficiently severe or pervasive to alter the conditions of [his or] her employment and create an abusive work environment [citations]. In addition, [he or] she must establish the offending conduct was imputable to [his or] her employer. [Citation.]" (*Id.*, at p. 279.)

"[A] plaintiff in a sexual harassment suit must show 'the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "*discrimina*[*tion*]

4

. . . because of . . . sex." ' [Citation.]" (*Lyle*, *supra*, 38 Cal.4th at p. 280.) " 'To plead a cause of action for . . . sexual harassment, it is "only necessary to show that gender is a substantial factor in the discrimination, and that if the plaintiff 'had been a man [or a woman he or] she would not have been treated in the same manner.' " [Citation.]' [Citations.] Accordingly, it is the disparate treatment of an employee on the basis of sex—not the mere discussion of sex or use of vulgar language—that is the essence of a sexual harassment claim." (*Ibid*.)

"[P]rohibited harassment includes 'verbal, physical, and visual harassment, as well as unwanted sexual advances.' [Citation.] In this regard, *verbal* harassment may include epithets, derogatory comments, or slurs on the basis of sex; . . . *visual* harassment may include derogatory posters, cartoons, or drawings on the basis of sex. [Citations.]" (*Lyle*, *supra*, 38 Cal.4th at pp. 280-281.) "On the other hand, a hostile work environment sexual harassment claim is not established where a supervisor or coworker simply uses crude or inappropriate language in front of employees or draws a vulgar picture, without directing sexual innuendos or gender-related language toward a plaintiff or toward women [or men] in general. [Citations.]" (*Id*., at p. 282.)

"The FEHA imposes two standards of employer liability for sexual harassment, depending on whether the person engaging in the harassment is the victim's supervisor or a nonsupervisory coemployee. The employer is liable for harassment by a nonsupervisory employee only if the employer (a) knew or should have known of the harassing conduct and (b) failed to take immediate and appropriate corrective action. [Citation.] This is a negligence standard. [Citation.] . . . [T]he FEHA makes the employer strictly liable for harassment by a supervisor." (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1040-1041.) Since the parties stipulated that Mason and Mendez were respondent's supervisors, the strict liability standard applies here.

*JNOV Standard of Review*

" 'The trial court's power to grant a motion for JNOV is the same as its power to grant a directed verdict. [Citation.] The court must accept as true the evidence supporting the jury's verdict, disregarding all conflicting evidence and indulging in every legitimate

5

inference that may be drawn in support of the judgment. The court may grant the motion only if there is no substantial evidence to support the verdict. [Citations.] On appeal from the denial of a motion for JNOV, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citation.]' [Citation.]" (*Jones & Matson v. Hall* (2007) 155 Cal.App.4th 1596, 1607.) "In applying the substantial evidence test, we view the facts in the light most favorable to the judgment, resolving all conflicts in [respondent's] favor and accepting all reasonable inferences deduced from the evidence. [Citation.]" (*Lazan v. County of Riverside* (2006) 140 Cal.App.4th 453, 458.)

*Substantial Evidence/Sexual Desire*

Appellant contends that its motion for JNOV should have been granted because the evidence is insufficient to establish that respondent "was harassed *because of* his sex and/or perceived sexual orientation." In denying the motion, the trial court stated: "[T]here was significant nonverbal communication that certainly underlined and focused on the sexual nature of the comments being made so that it did not appear . . . that these were mere derogatory comments, but were specifically sexual in nature, everything from attempted masturbation or simulated masturbation to the picture with a target on his mouth."

*Singleton v. United States Gypsum Company* (2006) 140 Cal.App.4th 1547 (*Singleton*), dictates affirmance of the JNOV denial. In *Singleton* two male coworkers continuously taunted plaintiff, a heterosexual male, by making statements suggesting that he was a homosexual. According to plaintiff, these statements "challenged [him] as a man." (*Id*., at p. 1553.) The coworkers threatened to perform sexual acts on plaintiff. One coworker said that " '[plaintiff] was having oral sex on [his] supervisor in the mornings out by the silo. That's why [he] was still employed by [defendant].' " (*Ibid*.) Plaintiff "testified that, as a result of [the coworkers'] comments and taunting, work became a 'living hell,' and that his performance was adversely affected." (*Id*., at p. 1554.) The taunting began after plaintiff complained to management about one of the coworkers. Plaintiff thought that the coworkers were making the abusive comments because of his complaint and because he had challenged one of the coworker's knowledge of equipment used at the workplace. (*Singleton*, *supra*, 140 Cal.App.4th at p. 1555.)

6

*Singleton* concluded that the coworkers' harassment of plaintiff was " 'because of sex' " within the meaning of the FEHA. (*Singleton*, *supra*, 140 Cal.App.4th at p. 1562.) The court reasoned: "[Plaintiff] recognized, as would any reasonable heterosexual male, that [his coworkers] targeted [his] heterosexual identity, and attacked it by and through their comments. [¶] . . . "[G]iven that [the coworkers] had targeted [plaintiff's] identity as a heterosexual male, it is axiomatic that they would treat women 'differently,' i.e., not attack them for the same reason. It follows that the harassment was 'because of sex,' i.e., it employed attacks on Singleton's identity as a heterosexual male as a tool of harassment." (*Ibid*.)

The court noted that the coworkers were "acting out . . . their anger and rage at [plaintiff]." (*Singleton*, *supra*, 140 Cal.App.4th at p. 1564.) "In this connection," the court declared, "there is no requirement that the *motive* behind the sexual harassment must be sexual in nature. '[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex.' [Citations.] Sexual harassment occurs when, as is alleged in this case, sex is used as a weapon to create a hostile work environment." (*Ibid*.)

As in *Singleton*, here sex was used as a weapon to create a hostile work environment for respondent. Mason and Mendez "employed attacks on [respondent's] identity as a heterosexual male as a tool of harassment." (*Singleton*, *supra*, 140 Cal.App.4th at p. 1562.) Pursuant to *Singleton*, therefore, substantial evidence supports the verdict.

In arguing that the evidence is insufficient, appellant relies on *Kelley v. The Conco Companies* (2011) 196 Cal.App.4th 191 (*Kelley*). The *Kelley* court criticized *Singleton*. In *Kelley* the plaintiff was a heterosexual male who "was subjected to a barrage of sexually demeaning comments and gestures by his male supervisor." (*Id*., at p. 196.) The supervisor said that plaintiff "had a 'nice ass,' " that he "would 'look good in little girl's clothes,' " that "he wanted to 'fuck [plaintiff] in the ass,' " that "he would make [plaintiff] 'his bitch,' " and that "he would 'cum all over [plaintiff's] ass.' " (*Id*., at p. 198.)

The *Kelley* court concluded that the supervisor's conduct did not constitute sexual harassment within the meaning of the FEHA because "[n]o evidence . . . was presented from

7

which a reasonable trier of fact could conclude that [the supervisor's comments] were an expression of actual sexual desire or intent by [the supervisor], or that they resulted from [plaintiff's] actual or perceived sexual orientation." (*Kelley*, *supra*, 196 Cal.App.4th at p. 205.) The court continued: "The literal statements expressed sexual interest and solicited sexual activity. . . . [But plaintiff] makes no contention here that [the supervisor's] statements were intended to be taken literally. Instead, it appears undisputed that in the environment in which this incident took place, sexually taunting comments by supervisors and employees were commonplace, including gay innuendo, profanity, and rude, crude and insulting behavior. Such comments were made both jokingly and in anger." (*Ibid*.) "Courts have routinely insisted on evidence that an alleged harasser was acting from genuine sexual interest before holding that the fact of a sexual proposition supported an inference of discrimination because of sex. [Citations.]" (*Id*., at pp. 205-206.)

The plaintiff in *Kelley* cited *Singleton* "in support of his argument that he was not required to show any sexual intent or motivation to establish his claim." (*Kelley*, *supra*, 196 Cal.App.4th at p. 206.) In explaining why it disagreed with *Singleton*, the *Kelley* court stated: "*Singleton* finds that the gender-specific nature of the harassment establishes disparate treatment based on sex. *Singleton's* reasoning inevitably leads to the conclusion that any hostile, offensive and harassing comment or conduct, with or without sexual content or innuendo, made to one gender and which would not be made to the other, would constitute discrimination because of sex within the scope of FEHA. [Citation.]" (*Id*., at pp. 206-207.)[2]

Appellant contends that *Singleton* was "wrongly decided." We believe that *Singleton* was correctly decided and we disagree with *Kelley*. The *Singleton* holding is narrow: a

---

[2] The *Kelley* decision sparked a legislative reaction. In 2013 the state legislature amended section 12940, subdivision (j)(4)(C), to provide: "Sexually harassing conduct need not be motivated by sexual desire." (Stats. 2013, c. 88, § 1, operative Jan. 1, 2014.) The author of the amendment stated: " 'This bill would overturn the decision in Kelley *v*. Conco Companies (2011) 196 Cal.App.4th 191, 1 Dist., and clarify that sexual harassment under [FEHA] does not require proof of sexual desire towards the plaintiff.' " (Assem. Com. on Labor & Employment, Bill Analysis, SB 292 (2013-2014 Reg. Sess.), June 26, 2013, p. 4.)

heterosexual male is subjected to harassment because of sex under the FEHA when attacks on his heterosexual identity are used as a tool of harassment in the workplace, irrespective of whether the attacks are motivated by sexual desire or interest.[3] Pursuant to Title VII of the Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e et seq.), which prohibits sexual harassment, "harassing conduct need not be motivated by sexual desire." (*Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 80 [118 S.Ct. 998, 140 L.Ed.2d 201].) "California courts frequently seek guidance from Title VII decisions when interpreting the FEHA and its prohibitions against sexual harassment. [Citation.]" (*Lyle*, *supra*, 38 Cal.4th at p. 278.) California courts have recognized that a sexual motive or interest is not required for sexual harassment under the FEHA. (See *Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 114 [plaintiff "need not show that the conduct was motivated by sexual desire"]; *Mogilefsky v. Superior Court* (1993) 20 Cal.App.4th 1409, 1418 ["The focus of a cause of action brought pursuant to Government Code section 12940 is whether the victim has been subjected to sexual harassment, not what motivated the harasser"].)

*Special Verdict Defect*

"[A] special verdict is that by which the jury find the facts only, leaving the judgment to the Court. The special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented as that nothing shall remain to the Court but to draw from them conclusions of law." (Code Civ. Proc., § 624.)

In *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 329, the court held that a fatally defective special verdict may be remedied by granting a motion for JNOV. "A special verdict is 'fatally defective' if it does not allow the jury to resolve every controverted issue. [Citations.]" (*Id.*, at p. 325.)

---

[3]  To establish a claim under the FEHA, such harassment because of sex must be " 'sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment and create an abusive work environment [citations].' " (*Lyle*, *supra*, 38 Cal.4th at p. 279.)

The special verdict form, which was prepared by respondent's counsel, failed to elicit conclusions for two of the elements of hostile work environment sexual harassment.[4] The jury answered "yes" to questions 1 through 4. By these answers, the jury found that respondent had been "subjected to unwanted harassing conduct based on sex and/or his perceived sexual orientation," that the harassment was "severe or pervasive," and that "a reasonable person in [respondent's] circumstances [would] have considered the work environment to be hostile or abusive." After question 4, the verdict form stated: "If your answer to question 4 is *yes*, then skip ahead to question 10." (Italics added.) The form should have stated: "If your answer to question 4 is *no*, then skip ahead to question 10." Because the jury's answer to question 4 was "yes," it followed the erroneous directions in the verdict form and skipped ahead to question 10.

Thus, the jury did not answer question 5, which asked: "Did [respondent] consider the work environment to be hostile or abusive?" Nor did the jury answer question 6 on causation: "Was the hostile or abusive work environment a substantial factor in causing harm to [respondent]?" Appellant argues that the special verdict "is fatally defective because it did not require the jury to resolve [these] two essential elements of a [sexual harassment] hostile [work] environment claim under the FEHA." "To be actionable, 'a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.' [Citations.] . . . [A] plaintiff who does not perceive the workplace as

---

[4] Pursuant to CACI No. 2521A, the trial court instructed the jury that, to establish his claim of hostile work environment sexual harassment, respondent must prove: "One, that [respondent] was an employee of [appellant]; two, that [respondent] was subjected to [unwanted] harassing conduct because of his sex and/or perceived sexual orientation; three, that the harassing conduct was severe or pervasive; four, that a reasonable man in [respondent's] circumstances would have considered the work environment to be hostile or abusive; five, *that [respondent] considered the work environment to be hostile or abusive*; six, that a supervisor engaged in the conduct within [appellant] or its supervisors or agents knew or should have known of the conduct and failed to take immediate and appropriate corrective action; seven, that [respondent] was harmed; and eight, *that the conduct was a substantial factor in causing [respondent's] harm*." (Italics added.) As we discuss below, the special verdict form failed to elicit findings on italicized elements five and eight.

10

hostile or abusive will not prevail, even if it objectively is so." (*Lyle*, *supra*, 38 Cal.4th at p. 284.)

The day before the defective verdict form was prepared, both parties and the trial court agreed upon a form that was free from errors. In his declaration in support of the motion for JNOV, appellant's counsel stated: "The next morning when we returned to court, [respondent's counsel] showed me the revised, final special verdict form that he had prepared. I looked it over and it appeared to incorporate the revisions the court and counsel had discussed the previous day. [Respondent's counsel] asked me if I approved of the form and I said that I did. [¶] When I looked over the special verdict form that [respondent's counsel] gave me, I did not notice that after question 4, the verdict form stated 'If your answer to question 4 is yes, then skip ahead to question 10.' As the court and the attorneys had discussed and agreed the day before, the verdict form should have stated, 'If your answer to question 4 is yes, then answer question 5. If you answered no, then skip ahead to question 10.' "

The trial court accepted appellant's counsel's version of events. During the hearing on the motion for JNOV, the court declared, "[C]ounsel reviewed the proposed jury verdict [form], and I guess we all failed to notice . . . what appears to be a typo."

"We analyze the special verdict form de novo" as a matter of law. (*Saxena v. Goffney*, *supra*, 159 Cal.App.4th at p. 325; see also *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 678.) "When a special verdict is involved as here, a reviewing court does not imply findings in favor of the prevailing party. [Citations.] This rule stems from the nature of a special verdict and its ' "recognized pitfalls," ' namely, that it requires the jury to resolve all of the controverted issues in the case, unlike a general verdict which merely implies findings on all issues in one party's favor. [Citations.]" (*Ibid.*)

## Waiver of Defects

The trial court concluded that appellant had waived or forfeited his claim that the special verdict was fatally defective because it had failed to object before the jury was discharged. We agree. " '*Failure to object to a verdict before the discharge of a jury and to*

*request clarification or further deliberation precludes a party from later questioning the validity of that verdict if the alleged defect was apparent at the time the verdict was rendered and could have been corrected.'* [Citation.]" (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 263-264, fn. omitted.) "The obvious purpose for requiring an objection to a defective verdict before a jury is discharged is to provide it an opportunity to cure the defect by further deliberation. [Citation.]" (*Juarez v. Superior Court* (1982) 31 Cal.3d 759, 764-765.) "The rule is designed to advance efficiency and deter gamesmanship." (*Keener v. Jeld-Wen, Inc.*, *supra*, 46 Cal.4th at p. 264.) " ' " ' " 'If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them . . . .' " ' [Citation.]" (Fn. omitted; [citations].)' [Citation.]" (*Id.*, at p. 265, fn. omitted.)

Here, " '*the alleged defect was apparent at the time the verdict was rendered and could have been corrected.*' " (*Keener v. Jeld-Wen, Inc.*, *supra*, 46 Cal.4th at p. 264.) When the jury was polled it was clear that the jury had not answered questions five and six on whether respondent considered the work environment to be hostile or abusive and whether such an environment was a substantial factor in causing him harm. Because appellant did not object and had expressly approved the erroneous verdict form, it forfeited its claim that the special verdict is defective because the jury did not answer questions five and six. (*Thompson Pacific Const., Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 550-551 [by not objecting, cross-defendant waived argument that special verdict form was defective for failing to require a finding on the materiality element of cause of action for filing a false claim with city under the California False Claims Act].)

In arguing against a forfeiture, appellant relies upon *Saxena v. Goffney*, *supra*, 159 Cal.App.4th 316, and *Behr v. Redmond* (2011) 193 Cal.App.4th 517. These cases are distinguishable. In *Saxena* the plaintiffs sued the defendant, a physician, for battery. The plaintiffs were the wife and children of a decedent. The battery claim was based on the defendant's performance of medical procedures on the decedent without his consent. The appellate court concluded that the special verdict form was fatally defective because it asked only whether the decedent had given his informed consent for the medical procedures, and a

battery cause of action requires that there be no consent.  The court rejected the plaintiffs' argument that the defendant had waived the defect by failing to challenge the special verdict.  The court reasoned: "There is no waiver here because [the defendant] raised the issue in the trial court.  He alerted the court to the difference between medical negligence [requiring lack of informed consent] and battery in his demurrer to plaintiffs' battery cause of action and he also objected to plaintiffs' special jury instruction on the grounds that it 'confuses [the issue of] informed consent with battery.' "  (*Saxena v. Goffney*, *supra*, 159 Cal.App.4th at p. 328.)  "[Defendant] repeatedly -- but unsuccessfully -- advised the court about the differences between lack of any consent and lack of informed consent."  (*Id*., at p. 329.)  In contrast to the defendant in *Saxena*, here appellant did not raise the defective verdict issue until after the jury had been discharged.

In *Behr v. Redmond*, *supra*, 193 Cal.App.4th 517, the plaintiff sued the defendant for transmitting genital herpes to her.  One of the plaintiff's causes of action was for fraud by misrepresentation.  This cause of action "was based on allegations that [defendant] misrepresented to [plaintiff] that she could not be infected with herpes if he was not having an outbreak of the disease at the time of sexual contact."  (*Id*., at p. 531.)  "[T]he special verdict form called for the jury to make a finding as to whether [defendant] 'fraudulently conceal[ed]' his genital herpes from [plaintiff], but did not call for a finding . . . as to whether [defendant] made any affirmative misrepresentation.  Nevertheless, the [trial] court entered judgment in plaintiff's favor on [the cause of action for fraud by misrepresentation]." (*Ibid*.)  The appellate court concluded: "Because a cause of action for fraudulent misrepresentation requires a finding that the defendant made a misrepresentation, the absence of such a finding precludes judgment for the plaintiff on that claim." (*Ibid*.)  The court further concluded that the defendant had not waived the issue by failing to object: "The failure to include a finding on the fact of misrepresentation is not an ambiguity that needed clarification; it is simply the absence of a factual finding necessary to support a cause of action. . . . [Defendant] 'is not challenging the special verdict form as such.  He merely argues the verdict form submitted by plaintiff[ ], and the verdict returned by the jury, does not support entry of judgment on a . . . theory' asserted in the complaint.  [Citation.] . . .

13

[T]he plaintiff[] had responsibility for submitting a verdict form sufficient to support her causes of action. [Citation.] If she chose not to include a proposed factual finding essential to one of her claims, it is not incumbent on . . . the defendant[] to make sure the omission is cured." (*Id.*, at pp. 531-532, fn. omitted.)

Unlike the plaintiff in *Behr*, respondent did not make a choice "not to include a proposed factual finding essential to one of [his] claims." (*Behr v. Redmond, supra*, 193 Cal.App.4th at pp. 531-532.) Both parties and the trial court agreed on a correct verdict form. The error in the verdict form prepared by respondent and expressly approved by appellant was an inadvertent "typo."[5]

*California Constitution, Article Six, Section 13.*

Irrespective of whether appellant forfeited its claim that the special verdict is defective, reversal is not required because the defect constitutes harmless error. It is true, as indicated, that the appellate court may not "imply findings" to "save" a defective special verdict. (*Saxena v. Goffney, supra,* 159 Cal.4th at pp. 325-326.) Many cases have so held. Nevertheless, this line of cases does not discuss the impact of California Constitution article six, section 13 or Code of Civil Procedure section 475. In both the civil and criminal context, our Supreme Court has often said: "Cases are not authority for propositions not considered." (*In re Marriage of Cornejo* (1996) 13 Cal.4th 38l, 383; *People v. Johnson* (2012) 53 Cal.4th 519, 528; *McWilliams v. City of Long Beach* (2013) 56 Cal.4th 613, 626.) It is an issue of first impression whether or not a defective special verdict can be "saved" by the harmless error rule. We hold that a defective special verdict form is subject to harmless error analysis. As we shall explain, here the error is harmless and there is no miscarriage of justice.

We reject appellant's contention that this error is "reversible per se," also known as "structural error." (See e.g. *People v. Cahill* (1993) 5 Cal.4th 478, 487-493*; Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573-581.) The use of a defective special verdict form did not deprive appellant of the right to jury trial or a fundamentally fair

---

[5] In its reply brief, appellant acknowledges that respondent's attorneys committed "an apparent typographical error . . . when they prepared the verdict form."

14

hearing. Appellant had a lengthy jury trial before a fair and unbiased trial judge and jury. They did what they were expected to do. They conscientiously considered the case in accordance with the facts and the law. The only thing that went wrong was the erroneous drafting of the special verdict form.[6]

The Constitution of the State of California, article six, section 13 in pertinent part provides: 'No judgment shall be set aside . . . as to any matter of procedure , unless after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." Its statutory counterpart, Code of Civil Procedure section 475, is even broader, and, in pertinent part, provides: "The court must, in every stage of the action, disregard any error or defect in the . . . proceedings which, in the opinion of said court, does not affect the substantial rights of the parties." Mr. Witkin has interpreted these rules as requiring affirmance of a judgment, even in the face of substantial error, if the judgment is "clearly right." (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 442, pp. 495-497 ["Cal. Const., Art VI, § 13, has its most striking effect on substantial error that was calculated to influence the court or jury. If, nevertheless, the judgment is the only proper one in the state of the record, i.e, under the pleadings and

---

[6] We acknowledge that in two criminal cases our Supreme Court stated in dictum that "the failure of a jury to reach any verdict on an essential element" is structural error. (*People v. Gamache* (2010) 48 Cal.4th 347, 396; *People v. Anzalone* (2013) 56 Cal.4th 545, 554.) This dictum is not applicable to the instant civil case involving a defective special verdict form. In criminal cases special verdicts are generally prohibited. (Pen. Code, § 1150 [jury may return a special verdict only when "they are in doubt as to the legal effect of the facts"]; *People v. Gurule* (2002) 28 Cal.4th 557, 631-632; *People v. Williams* (2001) 25 Cal.4th 441, 450.)

The dictum in *Anzalone* and *Gamache* contemplates a situation where a jury in a criminal case returns a general verdict of guilty without reaching agreement on an essential element of the offense. The dictum does not contemplate the situation here, where a jury in a civil case does not make a finding on an element of a cause of action because of a typographical error in the special verdict form. If it can be fairly determined that the jury would have found in favor of the plaintiff on that element, we see no reason, and there is no reason, for requiring a reversible per se rule. As the *Anzalone* court noted, "There is a strong presumption that any error falls within the trial error category," which is subject to harmless error analysis. (*People v. Anzalone*, *supra*, 56 Cal.4th at p. 554; see also *People v. Gonzalez* (2012) 54 Cal.4th 643, 663 ["an erroneous instruction that omits an element of an offense is subject to harmless error analysis"].)

15

evidence the same result would have been reached even if the error had not been committed, there is no miscarriage of justice."].)

Here, we easily conclude that the judgment is "clearly right." The facts and circumstances of this case are aggravated, even on paper. They compel the conclusions that 1. respondent personally considered the work environment hostile or abusive and, 2. such work environment was a substantial factor in causing him harm. The jury was expressly instructed on these two aspects of the case (*ante,* p. 10, fn. 4) and it is presumed that the jury followed these instructions. Thus, but for the typographical error, the jury would have answered "yes" to both questions five and six. Respondent was humiliated by the aggravated, continuous, and sustained course of sexual harassment. The jury determined that he had mentally suffered from the abuse and awarded him substantial monetary damages. Appellant attempts to demonstrate to the contrary by reason of its prevailing on the cause of action for wrongful termination. But, here it is apparent that respondent was terminated for subsequent and unrelated conduct. (See *ante* at pp. 3-4)

If we had a legitimate doubt concerning prejudice, we would reverse. In the quest for "perfect justice," we strive for just that. But there are some practical considerations to consider. Reversal for new trial or even a limited trial on the issue of damages entails an expenditure of time, effort, money, and scarce judicial resources. The parties had a full and fair trial. It lasted 10 days. It is not reasonably probable that appellant would prevail at a new trial on the two questions inadvertently omitted from the jury's consideration. We follow the constitutional mandate to reverse only when we are of the opinion that there has been a miscarriage of justice. No miscarriage of justice occurred here.

### *Sufficiency Of Evidence As To Noneconomic Damages*

Appellant contends that the evidence is insufficient to support an award of past noneconomic damages because respondent failed to show that the harassment had caused him "to suffer 'serious' or 'severe' emotional distress during his employment with [appellant.]" Appellant argues that respondent was required to prove "objectively serious emotional distress of such lasting and enduring quality that no 'ordinary, reasonable person would be []able to cope with it.' " Appellant is confusing a cause of action for hostile work

16

environment sexual harassment under the FEHA with a cause of action for the intentional infliction of emotional distress. The latter cause of action can be established only if the plaintiff suffered severe emotional distress. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050-1051.) " 'Severe emotional distress means " 'emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.' " ' [Citation.]" (*Id.*, at p. 1051.)

"Proof of the elements of the tort of intentional infliction of emotional distress is not a prerequisite for the recovery of compensatory damages [under the FEHA] for mental anguish and humiliation. [Citation.]" (*Stephens v. Coldwell Banker Commercial Group, Inc.* (1988) 199 Cal.App.3d 1394, 1403, disapproved on another ground in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 575, fn. 4.)

### *Claim that Award of Noneconomic Damages Erroneously Includes*
### *Damages for Emotional Distress Caused by Respondent's Discharge*

Appellant claims that the past noneconomic damages award of $150,000 erroneously includes damages for emotional distress that respondent suffered as a result of his discharge. The record does not support this claim. The jury found that appellant had not wrongfully discharged respondent. Therefore, as a matter of law, appellant was not liable for any emotional distress caused by respondent's discharge. We will not assume that the jury nevertheless awarded damages for such emotional distress. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

### *Claim that Award of Noneconomic Damages is Excessive*

Appellant argues that the award of $150,000 for past noneconomic damages is excessive. "The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. . . . [A]ll presumptions are in favor of the decision of the trial court [citation]. . . . An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506-507.)

17

Appellant raises the excessive noneconomic damages issue in a single paragraph: "At a minimum, the award is excessive and so grossly disproportionate to [respondent's] alleged distress [footnote 15 omitted] that it suggests passion or prejudice on the jury's part . . . . At the very least, the case should be remanded for a new trial on noneconomic damages, or alternatively, the Court should issue a remittitur significantly reducing the award to conform to the evidence." In footnote 15, appellant cites *Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397. Respondent's brief does not discuss the excessive noneconomic damages issue.

The excessive noneconomic damages issue is forfeited because the single paragraph on this issue is devoid of meaningful legal analysis. The rules require that each point in a brief be supported "by argument and, if possible, by citation to authority." (Cal. Rules of Court, rule 8.204(a)(1)(A).) The argument must include legal analysis. "When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary. [Citations.]" (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700.)

Even if a forfeiture had not occurred, appellant would not prevail on the merits. "[T]he verdict is [not] so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Seffert v. Los Angeles Transit Lines*, *supra*, 56 Cal.2d at p. 507.) "[T]here was substantial evidence of significant emotional distress." (*Kelly-Zurian v. Wohl Shoe Co.*, *supra*, 22 Cal.App.4th at p. 410.)

*Sufficiency of Evidence as to $10,000 Economic Damages*

Appellant argues that the evidence is insufficient to support an award of past economic damages. We agree. Respondent presented evidence of past lost compensation of $85,552, but this was based on what he would have earned had he continued to work for appellant. It was calculated as of the date of his discharge. Since the jury determined that respondent was lawfully discharged, he was not entitled to recover damages for lost compensation.

*Claim Regarding Excessive Attorney Fees*

Respondent sought attorney fees pursuant to section 12965, subdivision

(b), which provides in relevant part: "In civil actions brought under this section, the court, in its discretion, may award to the prevailing party . . . reasonable attorney's fees and costs . . . ."  Respondent's counsel, The Felahy Law Group, submitted an 86-page statement documenting the hours spent and services performed.  The statement shows total fees of $509,784 (the lodestar figure) based on 1,159.2 attorney hours and 373 law clerk hours. Allen Felahy billed 415.1 hours at $495 per hour.  Oscar Ramirez billed 335.8 hours at $395 per hour.  Joseph Sniezek billed 117.3 hours at $345 per hour.  Associate attorneys billed 291 hours at $265 per hour.  Law Clerks billed at $145 per hour.  Respondent requested that the trial court apply a multiplier of 1.5 to the lodestar figure for a total award of $764,676.

After a hearing, the trial court took the matter under submission and ruled in writing: "After carefully reviewing the parties' respective briefs and points and authorities, the court finds that [respondent] has established that he is entitled to an award of reasonable attorney fees in this case in the amount of $680,520.00 . . . ."  The court did not explain how it had calculated this amount.

"In determining the fee award, the trial court must first determine 'a "lodestar" or "touchstone" figure, which is the product of the number of hours worked by the attorneys and a reasonable fee per hour.'  [Citation.]  The trial court then has the discretion to increase or reduce the lodestar figure by applying a positive or negative ' "multiplier" ' based on a variety of factors.  [Citations.]"  (*Greene v. Dillingham Construction, N.A., Inc.* (2002) 101 Cal.App.4th 418, 422.)

" 'The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong" ' - meaning that it abused its discretion.  [Citations.]"  (*PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095.)  " ' " '[T]he appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' "  [Citations.]'  [Citation.] . . . We defer to the trial court's discretion 'because of its "superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters."  [Citation.]'  [Citation.]"

(*Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 418.) Here, there was no abuse of discretion.

The trial court must have used a multiplier because the award of attorney fees is greater than respondent's lodestar figure of $509,784. But the court did not specify the lodestar figure or the multiplier it had used to calculate attorney fees. Furthermore, the court did not specify the factors it had considered in selecting a multiplier.

Appellant contends that, because of the trial court's omissions, meaningful review of the attorney fee award is not possible. It argues that we must reverse and remand the matter to the trial court with directions to recalculate attorney fees. We disagree. It is reasonable to infer that the trial court selected either a lodestar figure o $453,680 and a multiplier of 1.5 ($453,680 x 1.5 = $680,520) or a lodestar figure of $486,086 and a multiplier of 1.4 ($486,086 x 1.4 = $680,520).

The trial court would have facilitated appellate review if it had specified the factors it had considered in selecting a multiplier. But its failure to do so does not compel a reversal. "In reviewing a challenged award of attorney fees and costs, we presume that the trial court considered all appropriate factors in selecting a multiplier and applying it to the lodestar figure. [Citation.] This is in keeping with the overall review standard of abuse of discretion, which is found only where no reasonable basis for the court's action can be shown. [Citation.]" (*Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 621; accord, *Downey Cares v. Downey Community Development Com.* (1987) 196 Cal.App.3d 983, 998.)

The following excerpt from *Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 67, is instructive: "We find no California case law . . . requiring trial courts to explain their decisions on all motions for attorney fees and costs, or even requiring an express acknowledgment of the lodestar amount. The absence of an explanation of a ruling may make it more difficult for an appellate court to uphold it as reasonable, but we will not presume error based on such an omission. . . . ' " 'All intendments and presumptions are indulged to support [the judgment] on matters as to which the record is silent, and error must be affirmatively shown.' " (*Denham v. Superior Court* [, *supra*,] 2 Cal.3d 557, 564 . . .

20

.)'  In the absence of evidence to the contrary, we presume that the trial court considered the relevant factors.  [Citation.]"

*The Trial Court Did Not Abuse Its*

*Discretion in Determining the Lodestar Figure*

As discussed above, it is reasonable to infer that the trial court reduced respondent's lodestar figure of $509,784 to either $453,680 or $486,086.

Appellant argues that some of the billings are unnecessary and duplicative.  We assume that the trial court took any unnecessary or duplicative billings into account when it reduced the lodestar figure proposed by respondent.  (*Denham v. Superior Court, supra*, 2 Cal.3d at p. 564.)  "[A]n experienced trial judge is in a much better position than an appellate court to assess the value of the legal services rendered in his or her court . . . ."  (*Children's Hosp. and Medical Center v. Bonta* (2002) 97 Cal.App.4th 740, 782.)  The trial judge was very experienced.  He stated: "[T]he court will utilize its own 38 years of civil practice in Ventura County with regard to analyzing [respondent's] attorney's fees hours and breaking it down to determine what is reasonable fees in this particular case."

In determining the lodestar figure, the trial court was not required to specify which hours it had allowed or did not allow: "In California, the trial court has no sua sponte duty to make specific factual findings explaining its calculation of the fee award and the appellate courts will infer all findings exist to support the trial court's determination.  [Citations.]  California courts have stated a disinclination to review the amount of an award when specific findings were not requested.  [Citations.]  [¶]  Thus, in California, it is incumbent on the party who is dissatisfied with the court's calculation of the number of allowable hours to request specific findings."  (*California Common Cause v. Duffy* (1987) 200 Cal.App.3d 730, 754-755, fn. omitted.)  Appellant "did not request specific findings and therefore may not now complain on appeal that [it does] not know which particular hours the court eliminated."  (*Id*., at p. 755.)

Appellant contends: "The requested lodestar amount of $509,784 for 1,532.2 hours is grossly inflated when considered in light of the single claim on which [respondent] succeeded, the amount of damages awarded on that claim, and the amount of time an

21

attorney might reasonably expect to spend in litigating such a claim." A reversal is not compelled merely because the lodestar figure substantially exceeds respondent's recovery of $150,000. Appellant has not cited any authority requiring that fee awards be proportional to the amount of damages recovered. (See *Harman v. City and County of San Francisco*, *supra*, 158 Cal.App.4th at p. 421 ["There is 'no mathematical rule requiring proportionality between compensatory damages and attorney's fees awards, [citation], and courts have awarded attorney's fees where plaintiffs recovered only nominal or minimal damages' "].)

Nor is a reversal compelled because the trial court did not apportion attorney fees between the one cause of action on which respondent prevailed and the three causes of action on which he did not prevail. " 'Where a lawsuit consists of related claims, and the plaintiff has won substantial relief, a trial court has discretion to award all or substantially all of the plaintiff's fees even if the court did not adopt each contention raised.' [Citation.]" (*Greene v. Dillingham Construction, N.A., Inc.*, *supra*, 101 Cal.App.4th at p. 423.) " 'Attorneys fees need not be apportioned between distinct causes of action where plaintiff's various claims involve a common core of facts or are based on related legal theories.' [Citation.]" (*Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 158-159.) Nor is "[a]pportionment . . . required when the issues in the fee and nonfee claims are so inextricably intertwined that it would be impractical or impossible to separate the attorney's time into compensable and noncompensable units. [Citation.]" (*Ibid.*) Here, the causes of action are inextricably intertwined. " '[E]mployment discrimination cases, by their very nature, involve several causes of action arising from the same set of facts.' [Citation.]" (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 431.)

*The Trial Court Did Not Abuse Its Discretion in Applying a Multiplier*

Finally, appellant asserts that the facts do not justify the application of any multiplier. Our Supreme Court has "set forth a number of factors the trial court may consider in adjusting the lodestar figure. These include: '(1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; [and] (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of

22

view of establishing eligibility for an award . . . ." (*Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 322, fn. 12.) In the trial court respondent claimed that these factors support the selection of a 1.5 multiplier. He makes the same claim on appeal.

We need not consider the first factor because the second and third factors alone support a multiplier. "[T]he unadorned lodestar reflects the general local hourly rate for a *fee-bearing case*; it does *not* include any compensation for contingent risk . . . . The adjustment to the lodestar figure, e.g., to provide a fee enhancement reflecting the risk that the attorney will not receive payment if the suit does not succeed, constitutes earned compensation; unlike a windfall, it is neither unexpected nor fortuitous. Rather, it is intended to approximate market-level compensation for such services, which typically includes a premium for the risk of nonpayment or delay in payment of attorney fees." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1138.) "In cases involving the enforcement of constitutional or statutory rights, 'such fee enhancements may make such cases economically feasible to competent private attorneys. [Citation.]' " (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 899.)

Furthermore, "the market value of the services provided by [respondent's] counsel in a case of this magnitude must take into consideration that any compensation has been deferred . . . from the time an hourly fee attorney would begin collecting fees from his or her client; that the demands of the present case substantially precluded other work during that extended [deferral] period, which makes the ultimate risk of not obtaining fees all the greater . . . ; and that a failure to fully compensate for the enormous risk in bringing even a wholly meritorious case would effectively immunize large or politically powerful defendants from being held to answer for constitutional deprivations [or deprivations of statutory rights], resulting in harm to the public." (*Horsford v. Board Of Trustees Of California State University* (2005) 132 Cal.App.4th 359, 399-400.)

*Disposition*

The orders denying appellant's motion for JNOV and awarding respondent $680,520 for attorney fees are affirmed. The judgment is modified to reduce respondent's damages from $160,000 to $150,000. As modified, the judgment is affirmed. Respondent

23

shall recover costs and reasonable attorney fees on appeal in an amount to be determined by the trial court on noticed motion.

CERTIFIED FOR PUBLICATION


YEGAN, J.

We concur:


GILBERT, P.J.


PERREN, J.

Frederick H. Bysshe, Judge

Superior Court County of Ventura

_____

Daniel K. Klingenberger, Micah K. Nilsson, Lynne Thaxter Brown and Stephanie Hamilton Borchers; Dowling Aaron Incorporated, for Appellant.

Alan B. Felahy and Oscar Ramirez; Felahy Law Group, for Respondent.