Filed 9/3/14  Lucero v. County of Kern CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| FLORENCIO LUCERO et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>COUNTY OF KERN et al.,<br><br>Defendants and Appellants. | F066704<br><br>(Super. Ct. No. CV-273050)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  William D. Palmer, Judge.

Theresa A. Goldner, County Counsel, Mark L. Nations and Andrew C. Thomson, Deputy County Counsel; Pollak, Vida & Fisher, Michael M. Pollak and Daniel P. Barer for Defendants and Appellants.

Law Office of Michael J. Curls, Michael J. Curls and Nichelle D. Jones for Plaintiffs and Respondents.

-ooOoo-

On December 18, 2010, Jose Lucero ingested a large quantity of meth-amphetamine and began to engage in bizarre behaviors, including hallucinating and repeatedly calling 911 about imagined events. The Kern County Sheriff's Department sent deputies to investigate the 911 calls and to check on the welfare of the caller. Jose[1] lived with his parents, Florencio and Lilia Lucero, along with his brother, Esteban Lucero, at his parents' home in Rosamond, California (the Lucero house). When the deputies arrived, Jose continued to make 911 calls, uttered threatening remarks to the deputies and held his parents from behind to apparently use them as human shields. The deputies decided that Jose would have to be brought into custody. According to the deputies' testimony, Jose was uncooperative and resisted arrest. In their efforts to restrain and handcuff Jose, the deputies tried several tactics, including the use of tasers, pepper spray and batons, but, as described by the deputies at trial, Jose seemed impervious to these techniques and continued to resist. During the deputies' struggle with Jose, Jose's parents were in a position to observe what transpired. Once the deputies were finally able to handcuff Jose, he was taken to a waiting ambulance outside. At that point, Jose's respiration and pulse dropped to critically low levels. The paramedics were unable to reverse the symptoms and minutes later Jose died.

Subsequently, Jose's parents (plaintiffs or parents) filed suit against the several deputies involved (i.e., Deputy Daniel Willis, Deputy Ryan Greer, Deputy Angelo Gonzalez and Deputy Jonathan Juden; the deputies) and Kern County[2] (collectively defendants) alleging causes of action for (i) wrongful death premised on negligence and (ii) negligent infliction of emotional distress. The case was tried before a jury, which

---

[1]    For convenience, we may refer to members of the Lucero family by their first names. No disrespect is intended.

[2]    The parties sometimes referred to Kern County as the Kern County Sheriff's Department. These are a single public entity, which we shall refer to as Kern County.

found in plaintiffs' favor on all the issues delineated on the special verdict form. The jury awarded damages to plaintiffs on both causes of action. After the jury was discharged and judgment was entered on the verdict, defendants moved for a new trial on the ground that the special verdict form was fatally defective. Defendants asserted that the special verdict form (i) failed to give the jury an opportunity to decide whether Jose was comparatively at fault in causing plaintiffs' damages and to apportion fault accordingly and (ii) erroneously permitted the jury to find that Kern County was liable based on a theory of nonstatutory, direct negligence. Plaintiffs opposed the motion, arguing that defendants intentionally tried the case using an "all or nothing" strategy and, having failed, should not be given a do-over. Plaintiffs further argued that any alleged defects in the special verdict form should have been brought to the trial court's attention prior to discharge of the jury, when there was still an opportunity to make corrections. The trial court denied the motion for a new trial. Defendants have appealed, reiterating the contentions made in their new trial motion. For reasons explained below, we will affirm the judgment of the trial court.

## SUMMARY OF FACTS

Circumstances Preceding the Incident

Because of past incidents in which Jose had resisted law enforcement officers and displayed assaultive behavior, the Kern County Sheriff's Department placed a "hazard" status on the Lucero house, which served as a warning to deputies and required the dispatcher to send at least two units to that location in response to a call. The deputies knew of this "hazard" status when they responded to the situation at the Lucero house on December 18, 2010.

The deputies were also aware of a few of the particular encounters that Jose had with law enforcement officers prior to December 18, 2010. For example, Deputy Willis had to deal with Jose on about 20 to 30 occasions. On most of those occasions, Jose was publicly intoxicated but remained cordial. Deputy Juden once came to the Lucero house

3.

in response to a violent fight between Jose and his brother, which episode resulted in Deputy Juden having to handcuff Jose. In 2007, another deputy, Deputy Perry,[3] responded to a complaint by Florencio that Jose had assaulted him. When Deputy Perry confronted Jose and attempted to arrest him, Jose forcibly resisted and fought Deputy Perry. During that altercation, Jose threatened to take Deputy Perry's baton and beat him with it, he was not affected by pepper spray and he displayed remarkable strength in an all-out struggle that did not end until another deputy arrived to provide assistance. All of the deputies had heard of this 2007 incident.

Jose had served several jail sentences, with his total jail time consisting of about four years. According to Florencio, while Jose was in jail he sustained a head injury. Afterwards, Jose was not the same mentally. Esteban similarly noted that approximately two years prior to the subject incident, Jose's personality had changed. Before that, Esteban could always tell if Jose was on drugs. After this change in personality, it became more difficult for Esteban to tell if Jose was on drugs. Jose remained isolated and in his "own little world," and he was strangely obsessed by the movie "Halloween."

In November 2010, Jose was released from jail and returned to live with his family at the Lucero house. His parole agent was John Flory. The day before the subject incident, Flory and other officers conducted a parole search at the Lucero house. Flory did not find anything out of the ordinary. At that time, Jose was cooperative and did not appear to be under the influence of drugs. In the garage, Flory did find a digital scale and an empty bag that might have contained methamphetamine remnants, but he could not tie those items to Jose.

Jose was a fairly large man, at approximately 5 feet 11 inches in height, and weighing between 270 and 290 pounds. On the date of the incident, Jose was 34 years old.

---

**3** Deputy Perry was not involved in the present case and is not a party.

Methamphetamine Ingestion by Jose on December 18, 2010

Within a few hours before the events that led to Jose's arrest on December 18, 2010, Jose ingested a toxic amount of the most powerful form of methamphetamine available. It was the opinion of Lawrence Borgsdorf, M.D., a pharmacist expert, that the methamphetamine was responsible for Jose's bizarre behavior that day. According to Dr. Borgsdorf, the ingested methamphetamine would be expected to result in hallucinations, paranoia, psychotic behavior, restlessness, extreme agitation, violent behavior, and desensitivity to pain.

The Deputies Investigate Jose's 911 Calls

On the afternoon of December 18, 2010, Jose began making a series of calls to 911 from the telephone at the Lucero house. He told the 911 operator that a friend who "lives in Lancaster" and is "a Deputy" "shot her husband." After reporting this, Jose hung up. Jose then called back and said he was a "snitch" and that his "sister," who was "getting beat up in Lancaster," was "tired of corruption." Jose also repeatedly mentioned a person named "Lucy"[4] as though he was speaking directly to her, even though no one named Lucy was present with him or on the telephone call. Jose made various other unintelligible statements.

Deputies Greer and Willis were both dispatched to the Lucero house in order to check on Jose's welfare. The deputies were advised by the dispatcher there was a "hazard" on the house; thus, two units were dispatched to that location. Another deputy, Deputy Gonzalez, heard the call and "put himself [e]n route" to the Lucero house to provide further assistance.

Deputies Greer and Willis arrived at the same time, in separate vehicles. They proceeded to the front door of the Lucero house and knocked, and Florencio opened the

---

**4**     Since there was no one at the Lucero house by that name, Jose's conversations with a "Lucy" during his calls to 911 operators were apparently hallucinations.

door.  The deputies explained why they were there and entered the home.  Following up on the 911 calls, the deputies asked what was wrong.  Jose was present in the living room with the deputies, and the deputies noticed he appeared to be agitated, sweating and rambling.  Jose asked the deputies why they were not in Lancaster.  He then turned and went down the hallway to his bedroom.  Deputy Greer yelled down the hallway to Jose, asking him to come out of the bedroom so that they could try to help him, but there was no response.  The deputies then went outside to talk about the situation, walking to the front sidewalk.  Esteban came outside with them and informed the deputies that Jose's mental condition was getting worse.  The deputies told Esteban about various community mental health resources that were available.  At that point, since nothing was going on at the house, the deputies were ready to leave.  While the deputies were still outside the house talking to Esteban, Deputy Gonzalez arrived.

At about the same time, Jose dialed several more 911 calls from his bedroom.  He identified himself to the 911 operator as an agent of Flory's and a "snitch," demanded to know if the Lancaster problem of "corruption" had been handled, threatened to "peg[]" the 911 operator, and told the operator, "What you need to do is die, okay."  Jose then told the 911 operator that his mother was next to him in the bedroom and that his brother (i.e., Esteban) had just hit their mother.  Jose asked the operator why the deputies had not arrested Esteban.  The dispatch operator promptly called Greer and Willis, informing them that Jose accused Esteban of hitting their mother.  Greer told dispatch, "that's a negative.  We are outside with [Esteban]."

The Deputies' Account of Jose's Arrest

The deputies' account of what happened next substantially differed from the account offered by Jose's parents and brother.  We shall first summarize the deputies' testimony of the circumstances surrounding Jose's arrest.

While the three deputies were talking on the front sidewalk with Esteban, Jose suddenly emerged from the front door of the house with his parents.  Jose was one or two

feet outside the front door, and his mother was in front of him and was being held by him. Jose had also grabbed his father. Jose yelled something to the deputies about them being "corrupt" and that Esteban should have been arrested by now. It appeared to the deputies that Jose's mother and father were resisting Jose, trying to get away, and Jose was attempting to tug them back into the house. Jose got back inside with his parents and closed the door. The deputies were concerned about the parents' safety and hurried to reenter the house.

When the deputies got inside, Jose was no longer holding his parents. Since the parents were away from where Jose was, the deputies focused their attention on Jose. Jose paced back and forth near the hallway and continued to mutter that he was a "snitch" and was ending "corruption." He repeatedly referred to or spoke to a "Lucy." Deputy Greer let dispatch know that Jose was continuing to exhibit bizarre, erratic behavior but noted he appeared to be unarmed. The deputies could see Jose's pupils were dilated, he was sweating profusely, he spoke rapidly and he had a blank stare. They feared he might be under the influence of PCP. Jose went through the hallway to the bedroom and returned holding a ballpoint pen, which he claimed was how he communicated with Flory. He held up the pen, his arm upraised, clicking the pen repeatedly, while approaching very close to Deputy Greer. Greer feared that Jose might stab him, but he was also afraid of escalating the situation. Deputy Willis urged Jose to give him the pen, and Jose lowered it and walked into the kitchen.

Jose looked at the pen under the stove light, then returned to the living room and went over to the couch, with a coffee table between him and his parents. From there, Jose made additional calls to 911. While the line was open, he said to the deputies, "They're going to have to shoot you. Just like, just like she shot that officer there in Lancaster." Deputy Willis believed Jose was saying he was going to shoot him (Willis). Deputy Willis informed Jose that if he continued to make 911 calls, he would be arrested.

7.

When Jose proceeded to call 911 again, Deputy Willis told Jose that he was under arrest and instructed him to put the phone down.

Jose then jumped over the coffee table, went over to Lilia and held her in front of him. It appeared to the deputies that Jose was using her as a human shield. Lilia was struggling to pull away from him. The phone was still in Jose's hand, and the open line recorded Jose saying, "Why, why am I holding my mom? 'Cause I'm scared officer." Deputy Greer was able to pull Lilia away from Jose. At that moment, Jose quickly moved to where Florencio was sitting and held him in place from behind the chair. Florencio managed to push Jose's hand away and stand up. Jose grabbed an object that was on the table, but Florencio knocked it out of his hand. Jose then picked up a long, "aim-a-flame" lighter and threw it at Deputy Willis, striking him in the chest.

Deputy Greer called dispatch to alert them that the deputies were engaged in a "148" with Jose, meaning that Jose was resisting arrest and that back-up assistance was requested. Deputy Juden received the call while on duty at the Rosamond substation. He immediately started driving to the Lucero house, which was approximately four miles away.

Jose next picked up the metal chair on which his father had been sitting. This action prompted the deputies to draw and deploy their tasers at Jose. Specifically, Deputies Gonzalez and Willis fired their tasers at Jose as soon as Greer was able to pull Florencio out of the way. Normally, if a taser is successfully deployed, the electric current or load will cause the person to be momentarily incapacitated or immobilized (his or her muscles will tense up and become rigid) and the person will fall over. Jose merely backed up and went down on one knee in what seemed to be a controlled motion; he was not incapacitated by the tasers. It appeared that either the tasers did not put Jose under an electric load or were ineffective. Several times, Deputy Greer ordered Jose to get down or "prone out," but Jose did not comply. Instead, Jose proceeded to grab the wires attached to the taser darts and pull.

A melee ensued in which Jose struggled for several minutes with the deputies. Jose was able to kick at the deputies from a crab-like position—what the deputies characterized as a mixed martial arts fighting stance. He pushed with his arms and also tried to grab the deputies legs. Jose's continued resistance prompted the deputies to continue to use their tasers, batons, and pepper spray on him. These methods were not stopping Jose's ability to resist. During the struggle, Jose squeezed Deputy Willis's hand, breaking one of Willis's bones.

While the deputies were engaged in this struggle with Jose, a neighbor, Harold Smizer, suddenly walked into the room. Deputies Greer and Willis drew their guns on Smizer, fearing a new threat. When Smizer was identified as a neighbor and one of Esteban's friends, the deputies ordered him out of the house. Greer and Willis reholstered their weapons and returned to their efforts to restrain Jose.

By the time Deputy Juden arrived at the scene in response to the "148" call, Jose was in the center of the room, standing up, with Deputies Greer, Willis and Gonzalez positioned around him. Deputy Greer was hunched over and looked totally exhausted. Deputy Gonzalez appeared to be affected by the pepper spray. Deputy Willis had a panicked look on his face and was using his baton but Jose was deflecting the baton blows or attempting to grab the baton. Upon entering the room, Deputy Juden could immediately smell and feel the effects of pepper spray in the air. Deputy Juden was so taken aback by what he saw that he shouted something to the effect of "what [do you] need me to do" to assist in Jose's arrest. One of the deputies replied that he should use his taser. Deputy Juden then deployed his taser on Jose. He retriggered the taser several times to cause additional five-second periods or "cycles" of electrical load. Deputy Juden's taser deployment was effective and it gave the deputies an opportunity to get Jose down to the ground and, after a further struggle, put handcuffs on him.

Jose was then taken out to the waiting paramedics for treatment. After Jose was placed in the ambulance, he suffered low respiration and pulse. The paramedics

9.

administered CPR and other life support, but could not reverse his symptoms.  Soon thereafter, Jose died.

The Luceros' Account of Jose's Arrest

The Luceros' account of the events surrounding Jose's arrest will now be summarized.

Esteban testified that after he spoke with the deputies on the sidewalk for several minutes and explained to them that Jose was not well mentally, the deputies indicated they were going to leave.  Esteban walked back into the house.  Jose and his parents had remained inside the whole time.  Soon after Esteban went back inside, the deputies reentered the house.  Esteban did not know why the deputies reentered.  The deputies began to question Jose further about his 911 calls.  Jose hid behind his mother and "hugged her" while the deputies asked him what was going on.  Then something happened that changed the officers' demeanors.  Jose made a statement "to the effect of 'I'll shoot you.'"  As soon as Jose said that, Deputy Willis said, "What, you threatened me?  You threaten me?  Is that what you are doing, threatening me?"  At that point, Jose backed away and went behind his father and hugged him.  Jose had his hands over his father gently; it was not a headlock.  The deputies drew their tasers and Esteban said, "'Don't shoot my Dad.'"  When Florencio was able to pull away from Jose, the deputies then fired their tasers at Jose.  Jose fell back and went to the ground, and then the deputies began to hit him hard with batons, "wailing on him" with "home run blows" of the batons.  Jose was on his back in a fetal position.  Each deputy hit Jose about 50 times.  Lilia was so hysterical that Esteban thought she would have a heart attack.  Because it was so horrible to watch and because of the pepper spray, he took Lilia and went out momentarily, but Lilia went back in.  Jose was not kicking or hitting anyone.  Finally, Jose was handcuffed and taken to the ambulance.

The testimony of Florencio and Lilia was similar to that of Esteban, but much more general and abbreviated.  In short, their perception was that the deputies beat up

10.

their son, who had mental issues and needed help, and their son died. Since their accounts of events corresponded to Esteban's, we do not repeat them here. We note that in Florencio's testimony, he included the fact that when he and Lilia went outside during part of the struggle, they could still see what was happening through the living room window.

Smizer, the neighbor, also briefly testified regarding what he saw at the moment he walked into the room during the melee. He said that Jose was in a fetal position down on the floor, not moving, while the deputies were repeatedly hitting him with batons.

Testimony Regarding Cause of Death

The defendants' medical expert, Charles Wetli, M.D., concluded that Jose died from "excited delirium due to methamphetamine toxicity." Dr. Wetli explained that the large dose of methamphetamine ingested by Jose resulted in hallucinations, aggressive behavior, increased body temperature, imperviousness to pain and fatigue, and an intense period of exertion. This state of excited delirium activated by the methamphetamine caused major surges in substances in the bloodstream affecting the heart, such as lactic acid, adrenalin and potassium. Once Jose was eventually restrained and there was a calming-down period, the sudden buildup of lactic acid, adrenalin and potassium was enough to stop his heart. In cases such as this, it is typical for cardiac arrest to set in shortly after the subject is restrained or calms down following an intense struggle.

Plaintiffs' medical expert, David Posey, M.D., agreed that the methamphetamine ingestion significantly contributed to Jose's death. However, Dr. Posey's opinion was that Jose's death resulted from multiple factors. That is, he opined that Jose's death was caused by methamphetamine intoxication complicated by an acute psychotic break, with an aftermath of blunt force trauma, electrical trauma, and pepper spray. In other words, Dr. Posey believed the trauma caused by the baton blows, the taser electrical shocks and the pepper spray were contributing factors in Jose's death, together with the methamphetamine.

11.

Experts on Police Practices and Use of Force

Joseph Callanan, the police practices expert retained by defendants, went through the deputies' account of the encounter with Jose step-by-step. Callanan concluded that at each point in the encounter, the deputies acted reasonably and in a manner that corresponded with good and reasonable police practices under all of the circumstances.

Plaintiffs' expert, Ron Martinelli, faulted the deputies in several respects in the manner of their response to what he characterized as more of a "medical" emergency involving Jose's obvious mental disorder and/or drug issues. Martinelli opined that the deputies should not have agitated Jose by unnecessarily "compress[ing]" Jose's time and space, but instead should have talked to Jose and sought the help of his parents and brother to convince Jose that they wanted to help him. Additionally, Martinelli believed the deputies should have swarmed Jose (seized him en masse) much earlier in the struggle, such as at the time of the first taser deployment. As for the tasers, Martinelli testified that based on taser download reports, the deputies fired and/or cycled their tasers multiple times, including 17 times by Deputy Gonzales, seven times by Deputy Willis, in addition to the taser deployment by Deputy Juden. Finally, and most importantly, Martinelli's opinion was that the deputies' multiple firing of tasers, repeated baton blows, and use of pepper spray, constituted unreasonable and excessive force against Jose under all of the circumstances.

Martinelli also opined that "the Kern County Sheriff's Department was negligent in the training provided to the involved deputies in the areas of use of force," including in regard to "[t]he electronic control weapons[,] impact weapon, the arrest and control techniques and chemical agents and … dealing with people with mental disorders." The deputies were examined by counsel concerning their training in these areas. Callanan found no deficiency in the deputies' training.

# PROCEDURAL HISTORY

Pleadings and Trial Motions

*The Pleadings*

In 2011, plaintiffs filed their complaint against Kern County (including the Kern County Sheriff's Department) and against Deputies Willis, Greer, Gonzalez and Juden. The complaint included multiple causes of action, including wrongful death and negligent infliction of emotional distress. In their answers to the complaint, defendants asserted among their affirmative defenses the comparative fault of Jose and plaintiffs. In addition, Kern County asserted the affirmative defense of governmental immunity based on the fact that liability of a public entity must be founded on statute.

*Motions in Limine*

Prior to the start of trial, defendants filed motions in limine requesting the trial court to exclude evidence and argument that Kern County was directly negligent for either general negligence or for negligent training. The motions were based on the fact that, except as provided by statute, public entities are immune from liability. The trial court denied the motions.

*Nonsuit Motion*

On November 5, 2012, defendants filed a motion for nonsuit at or near the end of the trial, reiterating their earlier arguments that public entities are immune from liability except as permitted by statute. Defendants asked the trial court to grant a nonsuit as to the causes of action premised on the direct negligence of Kern County for alleged negligent training. The trial court again rejected defendants' arguments and denied that portion of the motion. However, nonsuit was granted on a number of other causes of action as well as on the claim for punitive damages, leaving only plaintiffs' claims for wrongful death and negligent infliction of emotional distress to go to the jury.

*Directed Verdict as to Affirmative Defense*

On November 5, 2012, in a discussion between counsel and the trial court relating to jury instructions, defendants' counsel asked the trial court to include a particular instruction on the potential comparative fault *of plaintiffs* (Florencio and Lilia) as to their claim for negligent infliction of emotional distress, since at the time of Jose's arrest, plaintiffs allegedly disregarded or disobeyed the deputies' directives to leave the area. Not only did the trial court disagree with giving such an instruction, but it also invited plaintiffs' counsel to make an immediate oral motion for a directed verdict so as to eliminate from the case any defense that *Florencio and Lilia* were comparatively at fault in witnessing what happened to their son. Plaintiffs' counsel did so, and the trial court granted it. This was, in essence, a directed verdict that Florencio and Lilia were not comparatively at fault for having witnessed events. We note this ruling related only to plaintiffs' (i.e., Florence and Lilia) potential comparative fault; it had nothing to do with the jury's ability to consider *Jose's* comparative fault.

Jury Instructions and Special Verdict Form

One of the jury instructions given by the trial court was an instruction on comparative fault. The written form of the jury instruction utilized by the trial court indicated that the instruction was given "on Court's Motion." The comparative fault instruction informed the jury that defendants were claiming that "the fault of Jose Lucero also contributed to Lilia Lucero and Florencio Lucero's harm." The instruction explained that to succeed on this claim, defendants would have to prove that (1) Jose was at fault and (2) that the fault of Jose was a substantial factor in causing plaintiffs' harm. The instruction went on to state: "If you find that the fault of more than one person including Daniel Willis, Ryan Greer, Angelo Gonzalez and/or Jonathon Juden and Jose Lucero were substantial factors in causing Lilia Lucero and Florencio Lucero's harm, you must then decide how much responsibility each has by assigning percentages of responsibility to each person listed on the verdict form. The percentages must total 100 percent."

14.

Although the trial court read this instruction, neither attorney referred to it in oral argument or otherwise asked the jury to apportion fault. The jury failed to assign percentages of fault as required by the instruction.

The case went to the jury based on a special verdict form. The special verdict form framed the particular issues that the jury was being called upon to decide. It stated as follows:

> "1. Were the KERN COUNTY SHERIFF'S DEPARTMENT, DANIEL WILLIS, RYAN GREER, ANGELO GONZALEZ and/or JONATHAN JUDEN negligent?
>
> "_____ Yes _____ No
>
> "If your answer to question 1 is yes, then answer question 2. If you answered no, have the presiding juror sign and date the verdict form.
>
> 2. Was the KERN COUNTY SHERIFF'S DEPARTMENT'S, DANIEL WILLIS'[S], RYAN GREER'S, ANGELO GONZALEZ'[S] and/or JONATHAN JUDEN's negligence a substantial factor in causing harm to FLORENCIO LUCERO and LILIA LUCERO?
>
> "_____ Yes _____ No
>
> "If your answer to question 2 is yes, then answer question 3. If you answered no, have your presiding juror sign and date the verdict form.
>
> "3. Were LILIA LUCERO and FLORENCIO LUCERO present at the scene of the injury when it occurred, and aware that JOSE LUCERO was being injured?
>
> "_____ Yes _____ No
>
> "If your answer to question 3 is yes, then answer question 4. If you answered no, proceed to question 6.
>
> "4. Did LILIA LUCERO and FLORENCIO LUCERO suffer serious emotional distress?
>
> "____ Yes _____ No
>
> "If your answer to question 4 is yes, then answer question 5. If you answered no, proceed to question 6.

15.

"5.    Was the conduct [of] THE KERN COUNTY SHERIFF'S DEPARTMENT, DANIEL WILLIS, RYAN GREER, ANGELO GONZALEZ, JOHNATHAN JUDEN a substantial factor in causing LILIA LUCERO and FLORENCIO LUCERO's serious emotional distress[?]

"_____ Yes   _____ No

"After you answer question 5, then answer question 6.

"6.    Did the KERN COUNTY SHERIFF'S DEPARTMENT, DANIEL WILLIS, RYAN GREER, ANGELO GONZALEZ and JOHNATHAN JUDEN negligently cause the death of JOSE LUCERO?

"_____ Yes   _____ No

"If your answer to question 6 is yes, then answer question 7 a. and b. and if you answered questions 1, 2, 3, 4, and 5 yes, answer question 7 c., d., e. and f.  If you answered questions 1, 2, 3, 4 or 5 no; and answered question 6 no, have your presiding juror sign and date the verdict form.

"[7.]   What are LILIA LUCERO and FLORENCIO LUCERO'S damages?

"**Wrongful Death**

"a.    The loss of JOSE R. LUCERO'S love, companionship, comfort, care, assistance, protection, affection, society and moral support, from December 18, 2010 to the present:            $_____

"b.    The loss of JOSE R. LUCERO'S love, companionship, comfort, care, assistance, protection, affection, society and moral support from today forward:            $_____

"**Negligent Infliction of Emotional Distress**

"c.    Past Pain and Suffering for FLORENCIO LUCERO:  $_____

"d.    Past Pain and Suffering for LILIA LUCERO:  $_____

"e.    Future Pain and Suffering for FLORENCIO LUCERO:  $_____

"f.    Future Pain and Suffering for LILIA LUCERO:  $ _____"

As is evident from the above special verdict form, all defendants were lumped together without distinguishing the grounds for liability of the individual defendants (the

16.

deputies) and the public entity defendant (Kern County).[5] Moreover, the special verdict form did not provide the jury any opportunity to decide whether, or the extent to which, Jose may have been comparatively at fault. No place or line on the form addressed that issue. In short, the special verdict form did not ask the jury to apportion fault in any manner or provide a place for doing so.

Although defendants, through their counsel, thoroughly reviewed the special verdict form, defendants did not object to the special verdict form or assert that it was defective. Defendants did not make any objection or otherwise point out to the trial court that the special verdict form failed to include any means for the jury to apportion fault. Defendants concede they made no express objection to the special verdict form until the time that their new trial motion was filed, which was several weeks after the jury had been discharged and the judgment on the verdict entered.[6]

Jury Deliberations and the Verdict

During jury deliberations, the jury sent a written question to the trial court. The question asked: "Can we please have further clarification for question #5 regarding 'substantial factor[?]' Do we as a jury … can we take into account Jose Lucero's actions as well[?]" The trial court responded to the question by referring the jury to the instructions relating to the meaning of substantial factor, and stating "you may take into account Jose Lucero's actions."

---

**5** For this reason, it appears that the special verdict form allowed the jury to conclude that Kern County was one of the negligent actors (i.e., directly negligent). At the same time, no specific instruction was given to the jury on vicarious liability (or respondeat superior liability) of Kern County.

**6** Defendants note that they submitted a proposed alternative version of the special verdict form to the trial court. Defendants' proposed special verdict form did not include questions relating to whether Kern County was negligent. However, defendants concede that even their proposed special verdict form failed to contain questions about Jose's comparative fault.

17.

The jury returned a verdict in plaintiffs' favor. The jury responded in the affirmative to each of the questions on the special verdict form and then set forth the amount of damages awarded to plaintiffs. A total of $2.5 million was awarded to plaintiffs under the wrongful death cause of action and a total of $2 million was awarded under the negligent infliction of emotional distress cause of action, for a total damage award of $4.5 million. The above verdict was read on November 6, 2012, and the jury was discharged. On November 7, 2012, judgment was entered on the special verdict.

Motion for New Trial

Defendants moved for a new trial, claiming that the special verdict form was fatally defective for two reasons: First, it failed to allow the jury to decide whether or not Jose was comparatively at fault and to apportion fault. Second, it allowed the jury to premise liability against Kern County based on a theory of direct, nonstatutory negligence in violation of the principle that liability against a public entity must be based on statute. The motion for new trial also asserted that the trial court should not have granted a directed verdict as to defendants' asserted defense that plaintiffs were themselves comparatively at fault.

The trial court denied defendants' motion for new trial. The trial court noted, among other things, that defendants did not request a modification to the special verdict form regarding Jose's comparative fault, which failure was consistent with the manner in which defendants tried the case. That is, defendants presented the case in an "all or nothing" manner. As to the public entity liability issue, the trial court found it disturbing that defendants had presented the case to the jury as though the deputies and Kern County were "one," but "now" sought to separate out their liability.

Defendants filed a timely notice of appeal from the judgment.

18.

## DISCUSSION

### I. Standard of Review

We review the correctness of the special verdict form de novo. (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1242 (*Taylor*); *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325.) "'When a special verdict is involved as here, a reviewing court does not imply findings in favor of the prevailing party. [Citations.] This rule stems from the nature of a special verdict and its "'recognized pitfalls,'" namely, that it requires the jury to resolve all of the controverted issues in the case .… [Citations.]' [Citation.]" (*Taylor*, *supra*, at p. 1242.)

If defects in a special verdict form were likely to have prejudicially misled the jury, the error will ordinarily require a reversal of the judgment. (*Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125, 151-153 [special verdict form in the nature of jury instructions; same rules apply].)[7] Additionally, reversal may be warranted if the special verdict form omitted an essential element of the cause of action. (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 531-532 (*Behr*); *Saxena v. Goffney*, *supra*, 159 Cal.App.4th at p. 325 ["A special verdict is 'fatally defective' if it does not allow the jury to resolve every controverted issue."].) At the same time, a party's claim that the special verdict form was defective is subject to the usual rules of waiver and forfeiture (*Behr*, *supra*, at p. 530; *Taylor*, *supra*, 222 Cal.App.4th at p. 1242), and also to a harmless error analysis (*Taylor*, *supra*, at p. 1244).

---

[7]     "Among the factors which are considered in assessing the prejudice of an erroneous or misleading jury instruction are (1) the degree of conflict in the evidence on critical issues, (2) whether the jury requested a rereading or clarification of the erroneous instruction, (3) the effect of other instructions in remedying the error and (4) the closeness of the jury's verdict. [Citations.]" (*Scott v. County of Los Angeles*, *supra*, 27 Cal.App.4th at p. 152.)

19.

## II.       The Direct Liability Issue

A public entity is not liable for an injury "[e]xcept as otherwise provided by statute." (Gov. Code, § 815, subd. (a).)[8] "In other words, direct tort liability of public entities must be based on a specific statute declaring them to be liable, or at least creating some specific duty of care, and not on the general tort provisions of Civil Code section 1714. Otherwise, the general rule of immunity for public entities would be largely eroded by the routine application of general tort principles. [Citations.]" (*Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1183 (*Eastburn*).) The intent of the California Tort Claims Act (§ 900 et seq.; Tort Claims Act) is to confine the potential for governmental liability to rigidly delineated circumstances set forth by statute. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1127 (*Zelig*).) Accordingly, public entities cannot be found liable for nonstatutory, common law negligence. (*Eastburn*, *supra*, at p. 1183.)

While *direct* tort liability of a public entity must be based on a statute, section 815.2, subdivision (a), provides a basis for *vicarious* liability. Section 815.2, subdivision (a), states that "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment," provided that the act or omission would have given rise to a cause of action against the employee. (*Ibid*.) Thus, this section creates respondeat superior liability on the part of a public entity. (*Zelig*, *supra*, 27 Cal.4th at p. 1127.)

Although respondeat superior liability of a public entity is provided by section 815.2, subdivision (a), the distinction must be maintained that a public entity is not *directly* liable for its *own* negligence, except as specified by statute. "The Tort Claims Act draws a clear distinction between the liability of a public entity based on its own conduct, and the liability arising from the conduct of a public employee." (*Zelig*,

---

[8]       Unless otherwise indicated, all further statutory references are to the Government Code.

20.

*supra*, 27 Cal.4th at p. 1127.) As explained by our Supreme Court in *Zelig*: "Although the Act provides that a *public employee* generally is liable for an injury caused by his or her act or omission 'to the same extent as a private person' (Gov. Code, § 820, subd. (a)) and that, when the act or omission of the public employee occurs in the scope of employment the public entity will be vicariously liable for the injury (Gov. Code, § 815.2), the Act contains *no* provision similarly providing that a *public entity* generally is liable for its own conduct or omission to the same extent as a private person or entity. Rather, the Act provides that a public entity is not liable for an injury '[e]xcept as otherwise provided by statute .…' (Gov. Code, § 815.) Certain statutes do provide expressly for public entity liability in circumstances that are somewhat parallel to the potential liability of private individuals and entities but, as past cases have explained, '"[T]he intent of the [Tort Claims Act] is not to expand the rights of plaintiffs in suits against governmental entities, but to confine potential governmental liability to rigidly delineated circumstances .…"' [Citation.]" (*Id*. at pp. 1127-1128.)

No statute imposes direct liability on a public entity for its generic negligence in regard to hiring, supervision or training of its employees. (*de Villers v. County of San Diego* (2007) 156 Cal.App.4th 238, 252-256 [no direct liability for negligent hiring and supervision]; *Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077, 1113-1114 (*Munoz*) [no direct liability for negligent training of police officers regarding use of force], disapproved on other grounds in *Hayes v. County of San Diego* (2013) 57 Cal.4th 622, 639, fn. 1.) In *Munoz*, the jury specifically found that the public entity, i.e., the city, was 45 percent at fault and the individual police officer was 50 percent at fault. The city's fault was premised on its alleged direct negligence in failing to adequately train and supervise its police officers. (*Munoz*, *supra*, at pp. 1082-1083.) The Court of Appeal held that the portion of the verdict based on the city's direct negligence liability could not stand: "[W]e reverse that portion of the jury's verdict against Union City based on its direct negligence under authority of our Supreme Court's recent decision in *Eastburn*[,

*supra*,] 31 Cal.4th 1175 …, because the direct negligence theory advanced by respondents was not grounded on a violation of a statutory duty by the public entity (Gov. Code, § 815)." (*Id*. at p. 1082; see *Hilts v. County of Solano* (1968) 265 Cal.App.2d 161, 171 ["a verdict against a county must be overturned if it is erroneously based on a [nonstatutory] negligence theory"].)[9]

In the present case, when plaintiffs' case went to the jury, no statutory causes of action remained. The only claims presented to the jury were based on common law negligence for wrongful death and negligent infliction of emotional distress. In connection with these two causes of action premised on common-law negligence, the special verdict form not only included Kern County (referred to as the Kern County Sheriff's Department) among the several defendants, but asked the jury to decide whether or not such defendants (including Kern County) were negligent actors in causing Jose's death and plaintiffs' emotional distress. Although some of the questions on the special verdict form referred to the several defendants (including Kern County) using an "and/or" format, other questions used only the word "and." The jury answered all of the questions in the affirmative.

On this record, defendants' appeal argues that to the extent a portion of the liability may have been erroneously premised on a theory of direct (nonstatutory) negligence on the part of Kern County, reversible error occurred and a new trial should be ordered. Plaintiffs respond that defendants waived or forfeited the issue by failure to

---

[9]    A negligent supervision or negligent training cause of action might be available as a form of *vicarious* liability in a proper case, if it focused on the public entity's individual administrators and supervisory employees, and on whether those particular employees owed and breached duties of care to the plaintiff. Such a theory of liability would not "depend on blurring the line between direct and vicarious liability or on an assumption that a public entity's negligence liability is inherently vicarious." (*C.A. v. William S. Hart Union High School Dist*. (2012) 53 Cal.4th 861, 875.) Rather, such a theory (if proven) could make the entity liable under a vicarious liability theory encompassed by section 815.2.

adequately raise it in the trial court.  Finally, plaintiffs argue that the error, if any, was not prejudicial.

### A.    *Issue Not Forfeited*

On balance, we disagree with plaintiffs' contention that defendants forfeited this particular issue.  Although defendants failed to specifically object to the special verdict form on the ground that it improperly allowed the jury to decide Kern County's direct negligence, defendants *did* generally raise this issue in the trial court on a number of occasions.  Specifically, in addition to asserting the governmental immunity/section 815 defense in its responsive pleading, defendants raised this issue in both their motion in limine and their nonsuit motion.   Defendants also proposed an alternative to the special verdict form that did not include Kern County.  Yet, on each of these occasions, the trial court rejected defendants' position.  In light of this background and in recognition of the fact that governmental immunity is deemed jurisdictional in nature (see *Inland Empire Health Plan v. Superior Court* (2003) 108 Cal.App.4th 588, 592), we conclude that defendants have not forfeited the issue.

### B.    *Error Was Harmless*

However, we agree with plaintiffs that the error was not prejudicial and did not result in a miscarriage of justice.  (*Taylor*, *supra*, 222 Cal.App.4th at p. 1244 [harmless error analysis applies to defective special verdict form].)  Pursuant to article VI, section 13 of the California Constitution:  "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."  Additionally, Code of Civil Procedure section 475 broadly provides as follows:  "The court must, in every stage of any action, disregard any error, improper ruling, instruction, or defect, in the pleadings or proceedings which, in the

23.

opinion of said court, does not affect the substantial rights of the parties. No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown." As the Court of Appeal in *Taylor* recently held, "a defective special verdict form is subject to harmless error analysis" under the above provisions of law, and thus the judgment in such cases should be affirmed where the error is harmless and there is no miscarriage of justice. (*Taylor*, *supra*, at pp. 1244-1245.)

Here, as plaintiffs point out, there was substantial evidence of the deputies' negligence in the use of force against Jose.[10] Considering the outcome of the verdict, it is obvious that the jury agreed with plaintiffs' version of events and reached the conclusion that the deputies used unreasonable and/or excessive force on Jose. Indeed, unless there was such unreasonable (i.e., negligent) use of force, there could be no liability here against any defendants in this case. Since the jury clearly found such negligence on the part of the deputies, it follows that Kern County would be vicariously liable for the injury caused by the deputies' negligent acts or omissions in the scope of their employment under section 815.2, subdivision (a).[11] In light of this fact, there does not appear to be any actual prejudice to Kern County.

---

[10]    This is so whether or not we would have reached the same conclusion as the jury did in this case.

[11]    Although plaintiffs' complaint does not have a separate cause of action for respondeat superior liability, the complaint does allege the necessary facts for such liability, including the deputies' employment and the fact that their acts or omissions were in the scope of their employment with Kern County.

This conclusion fairly corresponds to the unique manner in which the case was presented to the jury—that is, no allocation or apportionment of fault was sought or argued by either side at trial. In this sense, defendants were simply lumped together as a whole, not unlike what might occur in connection with a respondeat superior liability claim. Meanwhile, defendants could have, but did not, attempt to avoid the purported problem concerning the special verdict form by objecting to it or otherwise informing the trial court that there was a defect in the wording of the special verdict form to the extent that it did not distinguish direct liability from the potential for vicarious liability. Not only was this not done, but it is apparent from the record that defendants' failure to ask the jury to apportion fault (or to find comparative fault) was an outworking of defendants' deliberate "all or nothing" strategy at trial, which consistently maintained that Jose alone was to blame for all that happened, not anyone else.[12] Finally, we note that here, unlike the situation described in *Munoz*, *supra*, 120 Cal.App.4th at pages 1082 to 1083, the jury did not make a specific finding that the public entity was a certain percentage at fault in distinction to the proportionate fault of the individual police officer involved. No such error in the particular terms or structure of the verdict needs to be undone here.

We lastly observe that even if the trial court had used the alternative version of the special verdict form that was proposed by defendants (which removed Kern County from the form itself), there is no reason to believe the outcome reached by the jury would be any different in terms of its impact on the county. Ultimately, Kern County would still be

---

**12** This "all or nothing" trial strategy was evident from defendants' opening statement, closing argument, the failure to ever seek or to argue apportionment at any time during the trial, and the failure to request a modification of the special verdict form to include a line for the apportionment of fault. At the time of the new trial motion, the trial court's assessment of the matter was the same—that is, the trial court recalled that defendants presented the case in an "all or nothing" strategy, in which "decedent Jose was the sole cause of his own demise."

25.

liable for the deputies' negligent acts or omissions (i.e., unreasonable use of force) based on the principles of respondeat superior liability (§ 815.2, subd. (a)).**13**

In conclusion, we find the defect in the special verdict form relating to Kern County's potential for direct negligence liability to have been harmless error under all of the circumstances, and it did not result in a miscarriage of justice. Accordingly, that defect is not grounds for reversal.

## III.  The Comparative Fault Issue

Defendants also argue that the special verdict form was fatally defective because it omitted a question on comparative fault and/or did not provide a place for the jury to determine Jose's comparative fault and to apportion fault accordingly. Plaintiffs argue that this claim of error was waived or forfeited by defendants' failure to adequately and timely object below. We agree with plaintiffs.

We find this claim of defect was forfeited for the following reasons. First, defendants' counsel had ample opportunity to review the special verdict form, and yet failed to make any objection to the form or to point out that it should have included a question for determining and apportioning comparative fault. Generally speaking, a defendant seeking to assert a defense of comparative fault or apportionment of fault should make sure the verdict form requests the jury to make such determinations. (*Kitzig v. Nordquist* (2000) 81 Cal.App.4th 1384, 1398.) Second, when defendants submitted their *own* proposed special verdict form to the trial court, it similarly failed to include any means to apportion fault, which indicates that defendants invited the very error of which they now complain. (See *Transport Ins. Co v. TIG Ins. Co*. (2012) 202 Cal.App.4th 984,

---

**13** The fact that the trial court allowed the jury to hear some expert testimony to the effect that Kern County was remiss in training its deputies did not result in any prejudice, because that same evidence largely overlapped with, or was duplicative of, the expert's testimony that described the type of police practices that would be reasonable for the individual deputies to employ under the circumstances.

1000 [noting rule that a party who requests, or acquiesces in, a particular form of a jury instruction or special verdict form cannot appeal the giving of that instruction based on doctrine of invited error]; *Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1653 [same].)**14**

Third, defendants failed to object before the jury was discharged, when there was still an opportunity to cure the alleged error. It is well established that a party may be deemed to have waived purported errors concerning a special verdict form by failure to object before the court discharges the jury. (*Taylor*, *supra*, 222 Cal.App.4th at p. 1242; *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 131; *Green v. Rancho Santa Margarita Mortgage Co.* (1994) 28 Cal.App.4th 686, 696; *Ateeq v. Najor* (1993) 15 Cal.App.4th 1351, 1359.) "'"The obvious purpose for requiring an objection to a defective verdict before a jury is discharged is to provide it an opportunity to cure the defect by further deliberation. [Citation.]' [Citation.] 'The rule is designed to advance efficiency and deter gamesmanship. [Citation.] ""'""If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them .…"'"" [Citation.]' (Fn. omitted; [citations].)" [Citation.]' [Citation.]" (*Taylor*, *supra*, 222 Cal.App.4th at p. 1242.)**15** When the verdict was read in

---

**14** We note that defendants' failure to object and their failure to include a comparative fault and/or apportionment request in their own proposed version of the special verdict form was consistent with defendants' apparent "all or nothing" strategy in trying this case. (See, *ante*, fn. 12.)

**15** The waiver rule, however, is not inflexible or automatic. (See *Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456, fn. 2 [noting exceptions to waiver].) At least one appellate court declined to find forfeiture where the appellant raised the claim of error by a motion for new trial. (*All-West Design, Inc. v. Boozer* (1986) 183 Cal.App.3d 1212, 1220.) Other decisions have found waiver despite the fact the error was raised by a motion for new trial. (*Jensen v. BMW of North America, Inc.*, *supra*, 35 Cal.App.4th at p. 131 [waiver found even though defect raised at new trial motion]; *Stevens v. Owens-Corning Fiberglas Corp.*, *supra*, 49 Cal.App.4th at pp. 1653-1655 [jury instruction agreed to by the appellant; therefore, error was invited—hence waived—despite raising it at new trial motion].)

the instant case, it was clear to all that the jury did not assign percentages of fault. Defendants did not object at that time, when the error could readily have been cured by sending the jury back for further deliberation.

Based on the foregoing, we conclude under all of the circumstances that defendants forfeited their claim of defect concerning the special verdict form relating to the omission in said special verdict form of a request to apportion fault.

## IV.    Directed Verdict as to Parents' Bystander Negligence

The trial court granted a directed verdict as to the affirmative defense alleged by defendants that plaintiffs (i.e., Florencio and Lilia) were comparatively at fault in regard to their bystander emotional distress claims. Defendants challenge the trial court's ruling. We conclude the trial court's ruling was correct.

We review a directed verdict de novo. (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210 (*Brassinga*).) "[T]he power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit." (*Estate of Lances* (1932) 216 Cal. 397, 400.) A motion for a directed verdict is in the nature of a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom. (*Brassinga*, *supra*, 66 Cal.App.4th at p. 210.) "If substantial evidence before the jury could have supported a finding that [the defendant] had established its … defense, the trial court erred in granting a directed verdict. On the other hand, if the record lacked substantial evidence supporting this defense, the directed verdict was proper." (*Ibid*.)

Defendants' assertion that plaintiffs were comparatively at fault in causing their own emotional distress was based on the contention that plaintiffs were told by the deputies to leave the room while Jose was being arrested. We agree with plaintiffs and the trial court that there was no substantial evidence before the jury that plaintiffs were, in any sense of the word, negligent or at fault in regard to their bystander emotional distress

28.

claims.  The evidence reflected that plaintiffs were able to perceive what was happening to their son even when they went outside onto the porch.  In any event, we fail to see how plaintiffs' parental conduct of continuing to observe how Jose was doing in light of the traumatic and violent events surrounding his arrest could, in the mind of any reasonable person, be deemed negligence on their parts.  In conclusion, the trial court correctly granted the directed verdict.

## **DISPOSITION**

The judgment of the trial court is affirmed.  Costs on appeal are awarded to plaintiffs.


_____

Kane, J.

WE CONCUR:


_____

Gomes, Acting P.J.


_____

Detjen, J.

29.