Filed 8/15/16  Moran v. Forever 21 Logistics CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ALBERTO MORAN, | B265988 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC536627) |
| v. | |
| FOREVER 21 LOGISTICS, LLC, | |
| Defendant and Appellant. | |

APPEALS from a judgment and an order of the Superior Court of Los Angeles County, Michael L. Stern, Judge.  Affirmed.

Gilbert, Kelly, Crowley & Jennett, Arthur J. McKeon, III, Jennifer C. Schmuldt, for Defendant and Appellant.

Rotson Law Group, Matthew Rotson, for Plaintiff and Appellant.

_____

Plaintiff and appellant Alberto Moran obtained a jury verdict and judgment of $199,000 against defendant and appellant Forever 21 Logistics, LLC on claims of age-based harassment and retaliation.[1]  Moran's counsel sought $421,130 in attorney fees, and the trial court awarded $116,925.  Forever 21 contends the jury's verdict and damage award were not supported by substantial evidence.  Forever 21 also contends the trial court erroneously excluded evidence reflecting the termination of other Forever 21 employees for reasons similar to the reasons proffered for Moran's termination.  Moran seeks additional attorney fees on appeal, contending the court abused its discretion in apportioning its attorney fee award.  Rejecting both parties' contentions, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

*Moran's employment and work environment*

Moran began working for Forever 21 in 1997, when he was over 40 years old. Around 2003, he started working as a driver, delivering merchandise to stores.  Jacobo Mendoza became Moran's supervisor about five years before trial.  Moran described Mendoza as always having a bad attitude and using foul language.  Jay Park was general

---

[1] References to Forever 21 in this opinion are to defendant and appellant Forever 21 Logistics, LLC.  We point this out to note the distinction between Forever 21 Logistics, LLC and Forever 21, Inc.  The former was substituted in as a Doe defendant, and the latter was initially named in Moran's complaint, but later dismissed.

[2] Moran filed a motion seeking sanctions and an order striking Forever 21's appellate briefs, as well as dismissing Forever 21's appeal on the grounds that the Forever 21's briefing painted an inaccurate picture of the evidence presented at trial.  We deny Moran's motion, but assure both parties that we have conducted an independent review of the record and in accord with the usual rules on appeal, we state the facts in the manner most favorable to the judgment or order being appealed from.  (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 755, fn. 2.)

manager, and Mendoza reported to Park. Several times, when Moran was unhappy with either his truck assignment or his route assignment and raised his concerns to Park, Park would tell him to talk to Mendoza. In November 2012, Moran gave Park a letter summarizing a dispute between himself and Mendoza about which truck was being assigned to Moran. According to the letter, Moran raised a concern about whether his assigned truck would pass inspection if stopped by the Highway Patrol, and Mendoza was not responsive to his concern. Moran ended by describing Mendoza as follows: "The tone of his voice sounded very prepotent. He is always answering with a bad attitude, tyrant and despotic." Moran received no response to his letter.

On December 6, 2012, Moran and Mendoza had a heated exchange after Mendoza again assigned Moran a truck Moran considered unsafe. When Moran voiced his concerns, Mendoza became angry and told Moran "you and me have a problem to resolve outside" and said, in Spanish, "Fucking old man, I am fed up with you." When Moran asked why Mendoza was treating him this way in front of others, Mendoza replied in Spanish, "me vale madre," which loosely translated means "I don't give a fuck." Moran summarized the incident in a letter, which he gave to Park. Again, he received no response. Mendoza reported the incident to human resources.

Moran gave Park another letter dated December 10, 2012, complaining about two earlier interactions where Moran complained about Mendoza assigning him to unfamiliar routes or unsafe trucks and being unresponsive when Moran would complain. Again, Moran never received a response.

On December 14, 2012, human resources gave written warnings to both Mendoza and Moran in relation to their disagreement from December 6, 2012. Moran testified that he refused to make a statement that day because he wanted think about what he needed to say, and they wanted him to respond immediately. Moran's warning referenced an earlier incident on September 26, 2012.

Moran gave another letter, dated December 14, 2012, directly to human resources. The letter summarized Moran's interactions with human resources when he was given his written warning. Moran wrote, "I went to complain about my incidents with [Mendoza]

3

and found out I already had two complaints on my behalf." He explained he felt wrongfully accused of things he did not do or say, and when he said he would go to human resources "at Corporate," he was told the warehouse did not have anything to do with corporate.

A few months later, at a meeting of company drivers led by Mendoza, Moran raised his hand to speak, and a co-worker named Joaquin Campos told him, in Spanish, "Be quiet, fucking old man. You are already old for this bullshit." Although Mendoza was present, he did not report the incident to human resources, instead telling Campos and Moran that shaking hands was enough. Again, Moran summarized the incident in a letter dated April 12, 2013. Moran delivered the April 12, 2013 letter to both Jay Park as well as Giselle Navar, a human resources supervisor.

Moran testified the absence of any response from the company to his complaints left him feeling unprotected and stressed. The continuing stress led to his separating from his wife of 26 years.

*Moran's activity selling pallets and his termination*

When Moran made deliveries in San Diego, someone named Mariano at the Plaza Bonita store would give him excess pallets, which he sold for around $2.50 to $3.00 a piece. He did this about 10 times in the year before he was terminated. He sold the pallets at a place where he would sometimes stop on his way back to the company to use the restroom or buy some ice cream or something to drink. Moran was never told not to collect or sell pallets, and was never questioned or warned against doing so until the day he was suspended in late October 2013.

In early October 2013, a supervisor named Joon Kim showed a video of Moran at A-1 Pallets to human resources manager Elizabeth Hernandez and human resources supervisor Navar. Hernandez testified that Moran's supervisor Mendoza was present in the conference room when they viewed the video. The source of the video was an unidentified third party vendor. Hernandez directed Navar to contact security and start an

4

investigation. On October 15, 2013, Navar sent an e-mail to a Forever 21 investigator named James Esquer summarizing a conversation about the video and a planned investigation of Moran and another driver. According to Navar, Moran's truck was shown on video at a particular location and "Jacobo [Mendoza] states this stop is made frequently and should not be made, this driver delivers to our San Diego Stores." After summarizing concerns about the other driver, Navar stated "Jacobo [Mendoza] and Joon [Kim] would like for us to be able to investigate both of them and if we find enough to separate both on the same date."

In mid-October 2013, Esquer observed Moran pulling out of the A-1 Pallet yard, but had arrived too late to see if Moran had sold any pallets. A few days later, Esquer videotaped Moran unloading about 15 pallets from his truck at A-1 Pallets. Under questioning by Forever 21 security, Moran admitted to stopping at A-1 Pallets numerous times, and his stops lasted between 2 to 9 minutes. Moran denied selling company pallets. Esquer did not further investigate to determine whether the pallets Moran was videotaped unloading were company pallets. Esquer observed five or six pallets in Moran's truck when it was returned, but he did not inquire about the number of pallets Moran had at the beginning of the day. Esquer also did not return to A-1 Pallets to determine whether they had received any company pallets from Moran. Immediately after questioning, Moran was placed on suspension for violating company policy. Esquer prepared a summary of his investigation for human resources.

Navar reviewed Esquer's report and prepared a summary. She e-mailed the summary to human resources manager Hernandez, recommending Moran's termination. Navar's e-mail summary included information about the potential personal gain Moran would have if he sold 15 pallets each time he stopped at A-1 Pallets. It described the "incident for suspension and final incident" as "theft of company property for personal gain," but also noted that "all stops were unauthorized stops and unauthorized breaks."

A week after he was suspended, Moran was called and told to appear at the company, where someone in human resources asked him to sign a paper promising not to hold anything against Forever 21. He refused to do so, and testified at trial that he did not

find out whether he had been fired or terminated.

*Moran's lawsuit*

After he was terminated, Moran obtained a right to sue letter from the Department of Fair Employment and Housing and filed suit against Forever 21 in February 2014. The complaint alleged five causes of action: (1) harassment/hostile work environment based on age, ancestry, national origin, and medical condition, (2) wrongful termination under the California Fair Employment and Housing Act (FEHA, Gov. Code, § 12940, et seq.),[3] (3) retaliation in violation of FEHA, (4) wrongful termination in violation of public policy, and (5) wrongful termination in violation of Labor Code section 1102.5.

Forever 21 moved for summary judgment and/or summary adjudication. Moran only opposed the motion with respect to his first and third causes of action, for harassment and retaliation respectively. On January 16, 2015, the court granted summary adjudication as to Moran's second, fourth, and fifth causes of action, as well as his claims of discrimination and retaliation based on ancestry, national origin or medical condition. The court permitted Moran to proceed only on his age-based harassment and retaliation claims.

The parties tried the case to a jury in May 2015. The jury returned a special verdict in favor of Moran on his hostile work environment and retaliation claims, and awarded him a total of $199,000.

Forever 21 filed motions for new trial and for judgment notwithstanding the verdict. The trial court denied both motions. Moran sought $421,130 in attorneys' fees, and the court granted $116,925. Forever 21 timely appealed from the judgment, and Moran filed a timely cross-appeal from the order granting attorney fees.

---

[3] All further statutory references are to the Government Code unless otherwise stated.

# DISCUSSION

## A. Sufficiency of the Evidence Supporting the Jury Verdict

### 1. *Substantial Evidence Standard of Review*

"Actions for unlawful discrimination and retaliation are inherently fact-driven, and we recognize that it is the jury, and not the appellate court, that is charged with the obligation of determining the facts. Nonetheless, the jury's verdict stands only if it is supported by substantial evidence." (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 389.) "In determining whether a judgment is supported by substantial evidence, we may not confine our consideration to isolated bits of evidence, but must view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court. [Citation.] We may not substitute our view of the correct findings for those of the trial court; rather, we must accept any reasonable interpretation of the evidence which supports the trial court's decision. However, we may not defer to that decision entirely. '[I]f the word "substantial" means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' [Citations.] [¶] Although each case must be judged for sufficient evidence on its own peculiar circumstances, a number of general guidelines may be set forth. First, a judgment may be supported by inference, but the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork. [Citation.] Thus, an inference cannot stand if it is unreasonable when viewed in light of the whole record. [Citation.] And although an appellate court will normally defer to the trier of fact's drawing of inferences, it has been said: 'To these well settled rules there is a common

7

sense limited exception which is aimed at preventing the trier of the facts from running away with the case. This limited exception is that the trier of the facts may not indulge in the inference when that inference is rebutted by clear, positive and uncontradicted evidence of such a nature that it is not subject to doubt in the minds of reasonable men. The trier of the facts may not believe impossibilities.' [Citations.]" (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1203-1204.)

### 2. *Hostile Work Environment Claim*

Forever 21 contends the jury's finding in favor of Moran's age-based harassment claim was not supported by substantial evidence. Forever 21's argument rests primarily on caselaw holding that a successful harassment claim must be based on substantial evidence of a "severe or pervasive" hostile work environment, and that "occasional, isolated, sporadic or trivial" acts are not enough. (See, e.g., *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 21; *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 283; *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 610 (*Fisher*).)

The FEHA prohibits harassment based on an employee's age. (§ 12940, subd. (j)(1).) "[H]arassment refers to bias that is expressed or communicated through interpersonal relations in the workplace." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 707.) The harassment must be "sufficiently pervasive to create a hostile or offensive work environment [as] determined from the totality of the circumstances." (*Fisher, supra,* 214 Cal.App.3d at p. 609.) Although a single incident of severe harassment may be sufficient to establish liability, the acts of harassment "must be more than occasional, isolated, sporadic (i.e., [they must be] pervasive), or trivial (i.e., [they must be] severe) . . . ." (*Etter v. Veriflo Corp.* (1998) 67 Cal.App.4th 457, 467.) Similar to sex-based harassment claims, "[t]he plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee and that [he or

8

she] was actually offended." (*Fisher*, *supra*, at pp. 609-610, fn. omitted.)

"In many cases, a single offensive act by a co-employee is not enough to establish employer liability for a hostile work environment. But where that act is committed by a supervisor, the result may be different." (*Dee v. Vintage Petroleum, Inc.* (2003) 106 Cal.App.4th 30, 36 (*Dee*).) In *Dee*, the court found there was a triable issue of fact on the issue of a hostile work environment where the plaintiff's supervisor made one disparaging remark about her Filipino ancestry coupled with a pattern of abusive non-racial remarks. "A reasonable trier of fact could infer that the racial slur was not an isolated event because it explained [the supervisor's] motivation for creating an abusive working environment for Dee." (*Id*. at pp. 36-37.) "When the harasser is a nonsupervisory employee, employer liability turns on a showing of negligence (that is, the employer knew or should have known of the harassment and failed to take appropriate corrective action)." (*Roby v. McKesson Corp.*, *supra*, 47 Cal.4th at p. 707.)

The totality of the circumstances in this case is sufficient to meet the substantial evidence threshold for a hostile work environment claim, because Mendoza was a supervisor, and there was evidence that the two documented instances where a supervisor and a co-worker referred to Moran as an "old man" in a demeaning and derogatory way were not isolated occurrences. Mendoza regularly used foul language in the workplace and was unresponsive to Moran's concerns about being assigned to trucks Moran considered unsafe. Moran had complained about his supervisor Mendoza's generally rude and abusive behavior a number of times. The supervisor called Moran a "fucking old man" in front of other employees, and never apologized. Later, when a coworker (Campos) told Moran "Be quiet, fucking old man. You are already old for this bullshit," Mendoza had the two men shake hands, rather than reporting the incident to human resources. In April 2013, Moran sought "an explanation from [Mendoza and Campos] as to why they call me 'old man' every time they insult me." The hostile work environment took its toll on Moran, contributing to the failure of his marriage of 26 years. Based on these facts, the jury could reasonably infer that the discrimination was sufficiently severe or pervasive to establish a claim of harassment.

9

3. *Retaliatory Termination Claim*

Forever 21 contends that the evidence introduced at trial on Moran's retaliation claim was insufficient to support the jury's verdict. The company seeks reversal on the grounds that Moran failed to show (1) he engaged in a protected activity, (2) a retaliatory animus, or (3) a causal link between the company's retaliatory animus and Moran's termination. We disagree.

FEHA prohibits employers from retaliating against employees for engaging in protected activity. (§ 12940, subd. (h).) Proof of retaliation often depends on circumstantial evidence because it consists of "'subjective matters only the employer can directly know, i.e., his attitude toward the plaintiff and his reasons for taking a particular adverse action.' (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 713.)" (*Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1219-1220.) Once an employer proffers a non-discriminatory explanation for an employee's termination, the employee must support his retaliation claim with substantial evidence of (1) a protected activity by the employee, (2) retaliatory animus on the part of the employer, (3) an adverse action by the employer, (4) a causal link between the retaliatory animus and the adverse action, (5) damages, and (6) causation. (*Id.* at pp. 1219-1220.)[4]

Because Forever 21 gave employee theft as its purported non-discriminatory reason for terminating Moran, the question turns to whether there was substantial

---

[4] We ignore the burden shifting analysis discussed in Forever 21's opening brief and discussed in many published cases because the procedural context is a jury trial, not summary judgment. "By the time that the case is submitted to the jury . . . the plaintiff has already established his or her prima facie case, and the employer has already proffered a legitimate, nondiscriminatory reason for the adverse employment decision, leaving only the issue of the employer's discriminatory intent for resolution by the trier of fact." (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 204.) "In short, if and when the case is submitted to the jury, the construct of the shifting burdens 'drops from the case,' and the jury is left to decide which evidence it finds more convincing, that of the employer's discriminatory intent, or that of the employer's race- or age-neutral reasons for the employment decision." (*Ibid.*)

evidence of protected activity, retaliatory animus, and causation.

There was substantial evidence Moran engaged in a protected activity when he submitted complaints about age-based harassment to general manager Jay Park and to the human resources department of Forever 21. "An employee is protected against retaliation if the employee reasonably and in good faith believed that what he or she was opposing constituted unlawful employer conduct . . . ." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 474.) "The FEHA should be liberally construed to deter employers from taking actions that would discourage employees from bringing complaints that they believe to be well founded. The act would provide little comfort to employees, and thereby would fail in its ameliorative purpose, if employees feared they lawfully could lose their employment or suffer other adverse action should they fail to phrase accurately the legal theory underlying their complaint concerning behavior that may violate the act." (*Miller v. Department of Corrections*, *supra*, at p. 475.) Moran's April 12, 2013 letter laid out the most recent incident of age-based harassment, when Campos told him in Spanish, "don't be an asshole, you are too old for that fucking shit." Moran's letter asked for an apology from Campos and an explanation from Campos and Mendoza for their continuing age-based insults, and raised the prospect of Moran filing a claim. The text of the letter clearly states: "I would like an explanation from [Campos] and [Mendoza] as to why they call me 'old man' every time they insult me. The fact that I am called 'old man' does not prohibit me from doing my work. I do not want things to escalate but if this continues I will see myself getting an attorney for harrassment [*sic*] because in various letters I have specified and described incidents of harrassments [*sic*] I've had and nothing has been done about it."

While there was contradictory evidence relating to Forever 21's retaliatory animus and the causal link to Moran's termination, viewing the evidence in the light most favorable to Moran, it is substantial enough that a reasonable jury could find that Moran's complaints about harassment were a "substantial motivating factor" in his termination. (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 232.) Once the case is submitted to the jury, "the jury is left to decide which evidence it finds more convincing, that of the

employer's discriminatory intent, or that of the employer's [nondiscriminatory] reasons for the employment decision." (*Caldwell v. Paramount Unified School Dist.*, *supra*, 41 Cal.App.4th at p. 204.)

Forever 21 argues that its then acting human resources manager, Elizabeth Hernandez, made the decision to terminate Moran based on three considerations: (1) Moran's admission that he deviated from his route to conduct personal business on company time, (2) a GPS report showing Moran made unauthorized stops, and (3) other evidence, such as photos and video and reports of concurrent investigations, provided by the company's security staff. This argument ignores the evidence from which a jury could reasonably infer that both Moran's supervisor, Mendoza, and the company human resources supervisor, Navar, were (1) aware of Moran's protected activity, and (2) actively involved in the decision to investigate and terminate Moran. Moran testified that he gave his April 12, 2013 letter complaining of age-based harassment to Navar, who was a human resources supervisor and had introduced herself to the Forever 21 drivers and told them they could come to her if they had any problems or complaints. Forever 21 incorrectly claims that there was no evidence Mendoza played any role, had any say, or offered any opinion on what discipline Moran should receive. To the contrary, an October 16, 2013 e-mail written by Navar states not only that Mendoza opined that Moran stopped at the pallet yard frequently and should not be doing so, but that Mendoza expressed a desire that Moran be "separated" on the same date as another driver suspected of unauthorized stops. In addition, Navar testified that Mendoza and Kim told her they wanted her to conduct an investigation, and that she was the one to review the videos and the security team's reports before recommending to Hernandez that Moran be terminated.

In addition, although at trial both Navar and Hernandez stated the reason for Moran's termination rested on "time theft," in the sense that Moran was conducting personal business on company time, Navar's e-mails focused on and went into great detail about the monetary benefit to Moran of selling pallets noting that "it is common for the receiver to pay cash for the delivery of pallets, once removed from the truck" and

12

extrapolating that Moran made $52.50 for selling 15 pallets when he was videotaped selling pallets, and made approximately $2,940 if he sold 15 pallets every time he stopped there. A jury could reasonably infer that the company's shifting rationale for terminating Moran was circumstantial evidence of retaliatory animus and causation.

Based on the foregoing, we conclude there was substantial evidence to support the jury's finding that Moran's protected activity was a substantial motivating reason behind Forever 21's decision to terminate him.

4.      *Damage Award*

Forever 21 contends the jury's damage award was not supported by substantial evidence. We disagree.

"[A]n award of damages will not be disturbed if it is supported by substantial evidence. [Citations.] The evidence is insufficient to support a damage award only when no reasonable interpretation of the record supports the figure. [Citation.]" (*Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 691.) "The general rule is that the measure of recovery . . . is the amount of salary . . . for the period of service, less the amount which the employer affirmatively proves the employee has earned or with reasonable effort might have earned from other employment . . . . [T]he employer must show that the other employment was comparable, or substantially similar, to that of which the employee has been deprived; the employee's rejection of or failure to seek other available employment of a different or inferior kind may not be resorted to in order to mitigate damages." (*Parker v. Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176, 181-182.) "[C]ourts have the obligation to contain expert testimony within the area of the professed expertise, and to require adequate foundation for the opinion." (*Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1523.)

The jury awarded Moran a total of $199,000 in damages, consisting of $71,000 in past economic losses, $108,000 in future earnings, and $20,000 in past mental suffering. Moran's expert testified that his total lost earnings figure of $179,000 was based on the

13

assumption that Moran would retire at 66. When asked during cross-examination what the calculation would be if Moran retired at 65, the expert responded that the amount "would be slightly lower than the $179[,000] that we calculated." Forever 21 argues that without an adequate foundation, expert testimony is not substantial evidence. Forever 21 claims the testimony about Moran's future earnings figure lacked adequate foundation because Moran's expert did not take into account Moran's age at retirement or government benefits received. However, Forever 21 never objected to the admission of the expert's testimony on future earnings, instead relying on the jury to award reduced damages if it believed Moran had retired.

"Where the *fact* of damages is certain, as here, the *amount* of damages need not be calculated with absolute certainty. The law requires only that some reasonable basis of computation be used, and the result reached can be a reasonable approximation." (*Acree v. General Motors Acceptance Corp.* (2001) 92 Cal.App.4th 385, 398, fns. omitted.) Moran satisfied this standard through his own testimony and that of his expert, an economist who calculated past and future lost earnings. The expert's opinion was largely unchallenged. Forever 21 does not point to any evidence that the damage award was unreasonable. As the jury's award was reasonably grounded in the testimony of Moran and his expert, the evidence was sufficient to support it.

## B. Exclusion of References to Similar Terminations

Forever 21 contends the court abused its discretion when it excluded testimony and documents reflecting that other employees of the company were terminated for selling company pallets around the same time as Moran's termination. Forever 21 argues that information about other terminations was relevant to preclude Moran from successfully arguing that the company's stated reasons for his termination were pretext.

Evidence Code section 352 gives the court discretion to exclude evidence whose prejudicial effect outweighs its probative value. A trial court has broad discretion in deciding whether evidence is relevant and whether to exclude it under section 352 of the

Evidence Code. (*Velasquez v. Centrome, Inc.* (2015) 233 Cal.App.4th 1191, 1211.) Forever 21 argues that by excluding the evidence, and precluding it from questioning Esquer about investigations of other drivers, the court prevented Forever 21 from conclusively establishing that its reasons for terminating Moran were not pretextual. However, there was still a reasonable basis to exclude such testimony based on the possibility of confusion and prejudice, given that the other drivers admitted to stealing company pallets, whereas Moran had not, and given that those other admissions were obtained *after* Moran was terminated. The trial court could reasonably conclude that the probative value of the excluded evidence was substantially outweighed by the added complexity and potential confusion of introducing evidence relating to the company's investigation and termination of other drivers. Forever 21 has not established an abuse of discretion.

## C.    Attorney Fee Award

After a successful jury verdict, Moran filed a motion for attorney fees and costs, seeking $421,130 in attorney fees. The amount was based on a lodestar figure of $248,130, consisting of 550 attorney hours billed at $420 per hour, and 22.8 paralegal hours billed at $125 per hour, plus 34 hours of anticipated attorney time for post-judgment motions. Moran requested a multiplier of 1.7. The trial court granted $116,925 in attorney fees, representing 50 percent of the fees claimed by Moran before post-judgment motions. The court pointed out that the case was a typical case, with "a typical trial and the typical amount of work that's done prepatory [*sic*] to trial." Because the causes of action for harassment and retaliation went to trial, the court concluded that 50% was justified and within the bounds of what the courts of appeal typically allowed. Moran contends the court erroneously used a multiplier of 0.5, instead of the requested 1.7, and also erred in disallowing post-judgment attorney fees.

"'The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it

will not be disturbed unless the appellate court is convinced that it is clearly wrong"'—meaning that it abused its discretion. [Citations.]" (*PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095.) "We defer to the trial court's discretion 'because of its "superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." [Citation.]' [Citation.]" *(Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 418.)

"The FEHA provides that the trial court, 'in its discretion, may award to the prevailing party reasonable attorney's fees and costs . . . .' (Gov. Code, § 12965, subd. (b).)" (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 393.) In ruling on a motion for attorney fees, a court begins with the lodestar amount, consisting of the number of hours worked multiplied by a reasonable hourly fee. Based on a variety of factors, the court may then increase or reduce the lodestar amount by applying a positive or negative multiplier. (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1249, quoting *Greene v. Dillingham Construction, N.A., Inc.* (2002) 101 Cal.App.4th 418, 422.) Our Supreme Court has described some of factors the trial court may consider, including: "(1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of view of establishing eligibility for an award . . . ." (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49.) "In reviewing a challenged award of attorney fees and costs, we presume that the trial court considered all appropriate factors in selecting a multiplier and applying it to the lodestar figure. [Citation.] This is in keeping with the overall review standard of abuse of discretion, which is found only where no reasonable basis for the court's action can be shown. [Citation.]" (*Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 621.) "[A]n experienced trial judge is in a much better position than an appellate court to assess the value of the legal services rendered in his or her court . . . ." (*Children's Hospital & Medical Center v. Bontá* (2002) 97 Cal.App.4th 740, 782.)

16

Moran contends that the trial court abused its discretion when it awarded only half of the lodestar amount. He argues that apportionment was not warranted because the claims that were eliminated at the summary adjudication phase were inextricably intertwined with the claims on which Moran prevailed at trial. He also argues that the apportionment is unreasonable because the bulk of attorney time was spent after Forever 21 filed its motion for summary judgment. We are unpersuaded.

"'Attorneys fees need not be apportioned between distinct causes of action where plaintiff's various claims involve a common core of facts or are based on related legal theories.' [Citation.]" (*Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 159.) "'Where a lawsuit consists of related claims, and the plaintiff has won substantial relief, a trial court has *discretion* to award all or substantially all of the plaintiff's fees even if the court did not adopt each contention raised.' [Citation.]" (*Greene v. Dillingham Construction, N.A., Inc., supra*, 101 Cal.App.4th at p. 423, italics added.)

Employment discrimination cases often involve intertwined factual and legal theories warranting a fee award that compensates an attorney for all theories, regardless of whether a party has prevailed on all claims. (See, e.g., *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 431 [noting that employment discrimination cases often inherently involve several causes of action arising from the same set of facts]; *Beaty v. BET Holdings, Inc.* (9th Cir. 2000) 222 F.3d 607, 612-613 [pointing out that a "high threshold for triggering decreases due to limited success reflects the values underlying the award of attorneys' fees in FEHA and other civil rights cases" and finding no abuse of discretion where fee award that did not reduce the lodestar amount based on lack of success in certain causes of action].) Here, however, it appears that the court did not base its award on an apportionment between claims that were eliminated at summary adjudication and those that went to trial. Instead, the court could have reasonably concluded that either the hourly rate or the overall amount of attorney fees was not warranted given the "typical" nature of the case. Considering that a significant portion of Moran's complaint resolved at the summary adjudication phase,

and Moran did not oppose summary adjudication on three of his five causes of action, we cannot say the court abused its discretion by applying a one-half multiplier in calculating the attorney fee award after Moran tried and prevailed on two causes of action.

Finally, Moran contends the trial court erred in denying his request to be compensated for the time he anticipated spending on opposing Forever 21's motions for new trial and for judgment notwithstanding the verdict. As if the court's denial of his request for work on post-judgment motions is somehow equivalent to a denial of time spent pursuing his request for attorney fees, he then cites to a Ninth Circuit case for the proposition that he is entitled to attorney fees for time spent litigating the fee request. (*Kinney v. International Broth. of Elec. Workers* (9th Cir. 1991) 939 F.2d 690, 695.) However, a party seeking a fee award "has the burden of submitting 'evidence supporting the hours worked and rates claimed.' [Citation.]" (*Webb v. Dyer County Bd. of Ed.* (1985) 471 U.S. 234, 242.) Given that Moran's counsel never submitted any documentation of time spent on post-judgment motions or preparing the fee request, we decline to find error.

## DISPOSITION

The judgment is affirmed. Each party will bear its own costs on appeal.



KRIEGLER, J.


We concur:



TURNER, P.J.                    RAPHAEL, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.